# Brooke et al. *versus* New York, Lake Erie, and Western R. R. Co.

1. A principal is bound by all the acts of his agent within the scope of the authority which he held him out to the world to possess, notwithstanding the agent acted contrary to instructions.

12 OUTERBRIDGE.—34

2. Where one of two persons must suffer by the act of a third person, he who has held that person out as worthy of trust and confidence, and as having authority in that matter should bo bound by it.

3. Whatever concerns the rights of parties in matters of contract is governed by the *lex loci contractus;* while the remedy, and whatever relates to the limitation of actions, by the *lex fori.*

4. A. was a railroad company, and its authorized shipping clerk at one of its stations issued a bill of lading in the company's name for certain goods that the company had never received. This bill of lading came to the hands of an innocent third person, who made advances of money upon it. Upon suit brought against the railroad company to recover such advances by said third party:

Held, that the company was estopped by the act of its agent from denying the receipt of the goods, although the clerk had no authority to give bills of lading without receiving the goods, and although the company had never done anything to lead any one to suppose that he had such authority.

January 28th, 1885. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK JJ.

ERROR to the Court of Common Pleas No. 2, of *Philadelphia county :* Of July Term 1884, No. 84.

Case stated, wherein Nathan Brooke and James H. Harper, trading as Brooke & Harper, to the use of said Brooke and Edward H. Pugh, trading as Brooke & Pugh, were plaintiffs, and the New York, Lake Erie, and Western R. R. Co., were defendants.

The following facts appeared from the case stated : The plaintiffs, Brooke & Harper, were grain commission merchants, in Philadelphia, prior to February 1st, 1881, on which day the firm was dissolved, Harper retiring, and Brooke being the liquidating partner. Brooke continued the business, and associated with him in partnership Edward H. Pugh, trading as Brooke & Pugh. The firm of Brooke & Pugh succeeded to the business plant of Brooke & Harper, and to the assets thereof, and assumed the liabilities of said firm, and continued business in the same place.

The defendant corporation, in February, 1881, was a common carrier for hire, duly incorporated under the laws of the State of New York, and acting as such, its shipping clerk, one P. J. Weiss, at Batavia, N. Y., executed and delivered to one F. C. Williams, of Batavia, N. Y., several bills of lading (hereinafter mentioned), acknowledging to have received from the said F. C. Williams certain quantities of barley, contained in certain cars, and to be carried by said defendant from Batavia to Philadelphia, and there to be delivered to said plaintiffs, Brooke & Harper; the freight on said barley to be paid by plaintiffs. Said consignments of barley by said Williams to the plaintiffs were made that plaintiffs might sell the

barley for the account of said Williams, and return him the net proceeds thereof; when the barley was consigned to Brooke & Harper, that firm had just dissolved, and been succeeded, as before stated, by the said firm of Brooke & Pugh, which received the said consignment, made advances thereon, and rendered an account of sales from time to time. All of said consignments were duly received by said plaintiffs but one car, No. 3967, the bill of lading for which was sent to plaintiffs, signed by P. J. Weiss. The contents of car No. 3967 were never delivered by defendants, though bill of lading for same was duly presented by plaintiffs and the contents demanded.

A summary of all the charges and credits on all the consignments received by plaintiffs from said Williams up to May 31st, 1881, is as follows :—

| 1881. | DR. | | | | | |
|---|---|---|---|---|---|---|
| Feb. 10th, | To bills payable | . | . | . | $750 | 00 |
| " 18th, | " | | . | . | 750 | 00 |
| " 24th, | " | | . | . | 750 | 00 |
| " 26th, | " | . | . | . | 800 | 00 |
| " 28th, | " | . | . | . | 800 | 00 |
| May 31st, | Interest | . | . | . | 10 | 38 |
| | | | | | $3,860 | 38 |

| 1881. | Cr. | | | | | |
|---|---|---|---|---|---|---|
| May 31st, | By net proceeds | . | . | . | $771 | 18 |
| " " | " | . | . | . | 411 | 43 |
| " " | " | . | . | . | 810 | 40 |
| " " | " | . | . | . | 660 | 96 |
| " " | " | . | . | . | 673 | 06 |
| " " | " | . | . | . | 232 | 91 |
| " " | By balance | . | . | . | 300 | 39 |
| | | | | | $3,860 | 38 |

1881.
May 31st, . To balance due Brooke & Pugh
on the whole amount	.	$300 39 .

By fraudulent collusion of the said F. C. Williams and the shipping clerk of the defendant at Batavia, the said P. J. Weiss, the bill of lading dated February 15th, 1881, for the contents of the said car No. 3967, was given by the said P. J. Weiss to the said F. C. Williams, when in fact the alleged contents of the said car No. 3967 were never received by the said Weiss or the defendant from the said F. C. Williams, as stated in said bill of lading. Of this, however, the plaintiffs had no knowledge until after the declaration was filed in this suit.

[Brooke *v.* N, Y., Lake Erie and West. R. R. Co.]

While the said P. J. Weiss, the shipping clerk of the defendant, was duly authorized to issue bills of lading for goods actually received, he had no authority whatever to issue such bills of lading without receiving the goods therein mentioned, nor had the defendant ever done or said anything to lead any one to suppose that they had authorized the said Weiss to issue bills of lading without receiving the goods therein mentioned.

None of the bills of lading stated the number of bushels in any car, but each bill of lading was for a " car of barley in bulk," and specified the number of the car. That the quantity actually delivered to plaintiffs was ascertained by measurement, and accounted for by plaintiffs to Williams as above set forth; but the said car No. 3967, covered by bill of lading dated February 15th, 1881, never having been received by plaintiffs, its contents are estimated at $501\frac{2}{48}$ bushels of barley, by reference to the contents of the same car received by plaintiffs on a former shipment of February 9th, 1881, when the contents of said car No. 3967 amounted by actual measurement to $501\frac{2}{48}$ bushels. It was submitted to the Court whether or not this estimate is a legal and proper one under the circumstances.

It was agreed that all the statutes and decisions of the Courts in the State of New York, so far as applicable, should form part of this case stated, and that extracts from and reference to the same should be annexed, and treated as though written at length herein, subject to the objection of, the defendant that the same are irrelevant.

If, upon the above state of facts, without regard to the form of action and form of the pleadings, the Court should be of opinion that the plaintiffs are entitled to recover from the defendant the amount of the loss sustained by them upon their account with F. C. Williams, by reason of his overdraft upon them, or by reason of the non-delivery by the defendant of the contents of car No. 3967, as stated in their bill of lading, then judgment to be entered for the plaintiffs for the sum of $300.39, with interest from May 31st, 1881 (being the balance actually due the plaintiffs on the whole account); or, if the Court be of opinion that the defendant has a right to require the plaintiffs to appropriate the proceeds of the contents of car No. 14,341 to the deficiency occasioned by the non-delivery of the contents of car No. 3967, as called for in the bill of lading; or that the defendant could recover the value of the said proceeds in a proper form of action against the plaintiffs, then judgment to be entered for the plaintiffs for the sum of $105.61, with interest from May 31, 1881, being the difference between the deficiency on the shipment covering the missing car, to wit, $338.52, and the car 14,341, to wit: $232.91.

But if the Court should be of opinion that the defendant is not liable at all, on the above state of facts, then judgment to be entered for defendant.

The following was appended to the case stated.

## POINTS DECIDED BY THE COURTS OF NEW YORK.

A common carrier who signs a bill of lading for more goods than are shipped by the consignor, and has paid the consignee for the deficiency, may recover the amount from the consignor : Graves *v.* Harwood, 9 Barb., 477.

If the agent of the carrier issue a bill of lading for goods not received, and a third person in good faith advances money on the bill of lading, the carrier is liable to make good his loss.

"Street (the agent) having power to issue bills direct to consignees, for goods actually in the possession of the defendant, and the present bills being in no way distinguishable in form from those which were usually employed, he must be considered as having the necessary authority as to the plaintiffs acting in good faith : " Armour *et al. v.* The Michigan Central R. R. Co., 65 N. Y., 111.

If the carrier issue a bill of lading to a person who has no title to the property, whereby the latter is enabled to obtain an advance thereon, the carrier is liable in damages to the person so defrauded : Farmers' and Mechanics' Bank *v.* The Erie R. R. Co., 72 N. Y., 188.

A *bona fide* purchaser of a chose in action, *not negotiable,* from one on whom the owner has conferred the apparent ownership, obtains a valid title as against such owner, although his vendor had not such title : Moore *v.* The Metropolitan National Bank, 55 N. Y., 41 : McNeil *v.* The Tenth National Bank, 46 Id., 325.

Where the bill of lading is drawn directly to the consignee, and not to the order of the consignor, the right of action of the consignee against the carrier is not derived through the consignor, but rests upon the direct relations between the consignee and the carrier established by the bill of lading : Armour *v.* The Michigan Central R. R. Co., 65 N. Y., 120-123.

When a bill of lading requires the delivery of the goods to a named consignee, no action can be maintained by the consignor against the carrier without the consent of the consignee : Shepard *v.* Heineken, 2 Sw., 525.

A carrier is discharged from liability by a delivery to the person to whose care the goods are directed, though such person be the carrier's agent : Bristol *v.* Renssellaer and Saratoga R. R. Co., 9 Barb., 158 ; Platt *v.* Wells, 2 Rob., 101 ; S. C., 26 How. Pr., 442.

Any delivery which discharges the carrier, as between him and the consignee, is good as against the consignor. In the absence of notice to the contrary, the carrier is authorized to treat the consignee as entitled to control the manner of delivery: Sweet *v.* Barney, 23 N. Y., 335; S. C., 24 Barb., 533; O'Dougherty *v.* Boston & Worcester R. R. Co., 1 S. C., 477.

EXTRACTS FROM REVISED STATUTES OF NEW YORK. Vol. 3, pages 2259 and 2260.

Law of 1858. Chapter 326. An Act to prevent the issue of false receipts and to punish fraudulent transfers of property by warehousemen, wharfingers and others.

Section 5. No master, owner, or agent of any vessel or boat of any description, or officer or agent of any railroad company or other person, shall sign or give any bill of lading, receipt, or other voucher or document for any merchandise or property, by which it shall appear that such merchandise or property has been shipped on board any vessel, boat, or railroad car unless the same shall have been actually shipped and put on board, and shall be at the time actually on board or delivered to such vessel, boat, or car, to be carried and conveyed as expressed in such bill of lading, receipt, or other voucher or document.

Sec. 6. Warehouse receipts given for any goods, wares, merchandise, grain, flour, produce, or other commodity stored or deposited with any warehouseman, wharfinger, or other person may be transferred by indorsement thereof, and any person to whom the same may be so transferred shall be deemed and taken to be the owner of the goods, wares, and merchandise therein specified, so far as to give validity to any pledge, lien, or transfer made or created by such person or persons; but no property shall be delivered except on surrender and cancellation of said original receipt or the indorsement of such delivery thereon in case of a partial delivery. All warehouse receipts, however, which shall have the words "not negotiable" plainly written or stamped on the face thereof shall be exempt from the provisions of this section.

Sec. 7. Any warehouseman, wharfinger, inspector, or other person, who shall wilfully violate any of the foregoing provisions of the said Act as hereby amended, shall be deemed guilty of a misdemeanor, and upon indictment and conviction shall be fined in any sum not exceeding one thousand dollars, or imprisonment not exceeding one year, or by both such fine and imprisonment, and all and every person or persons aggrieved by the violation of any of the provisions of said Act as hereinbefore mentioned, may have and maintain an action

at law against the person or persons violating any of the provisions of said Act, as hereby amended, to recover all damages, immediate or consequential, which he or they may have sustained by reason of any such violation as aforesaid, before any Court of competent jurisdiction, whether such person shall have been convicted as hereinbefore mentioned or not.

Law 1859. Chapter 353. An Act to amend the Act entitled An Act to prevent the issue of false receipts and to punish fraudulent transfers of property by warehousemen, wharfingers, and others, passed April 17th, 1858.

Section 1. The sixth section of the Act entitled "An Act to prevent the issue of false receipts and to punish fraudulent transfers of property by warehousemen, wharfingers, and others," is hereby amended by adding at the end of said section the following words: All the sections of the Act hereby amended shall apply to and be applicable to bills of lading, and to all persons or corporations that shall or may issue bills of lading, of any kind or description, the same as if the words "forwarders and bills of lading" were mentioned.*

The Court entered judgment upon the case stated for the defendant, HARE, P. J., filing the following opinion:—

"The plaintiffs, as we are informed by the case stated, were commission merchants of this city; Williams, a dealer in produce in the state of New York, which he forwarded to the plaintiffs for sale; and Weiss, a shipping clerk at Batavia, in the same state, of the New York & Erie Railroad Company, who are the defendants in this suit. Weiss gave a bill of lading in the name of the company to Williams, purporting to be for a carload of barley consigned directly to the plaintiffs, but no such barley was in fact delivered to the company or received on their behalf, and the signature of the bill was not an act done negligently by Weiss in the course of his employment, but a forgery committed deliberately by him in concert with Williams, with the view of defrauding the plaintiffs at the expense of his principals. Williams transmitted the bill of lading through various intermediate channels to the plaintiffs, with an accompanying draft for $750, which was accepted and paid in the belief that the barley had been shipped and would be forthcoming in due season. Its non-arrival led to the discovery of the cheat, and a demand by the plaintiffs on the company for compensation, which was refused on the ground that Weiss exceeded his powers in entering into a contract for the transportation of barley which had not been

* The above "Extracts" do not follow literally the verbiage of the statutes.—REP.

received, and for aught that appeared did not exist save in the imagination of the contrivers of the fraud.

"If the case is to be decided in accordance with the law merchant, as defined in Grant *v.* Norway (10 C. B., 687), it can have but one result.   It was there held that broad as is the authority of the master of a vessel, it does not extend to signing bills of lading for goods not put on board, and that all persons are bound to take notice that such is the rule.    Grant *v.* Norway is followed in England and by the Supreme Court of the United States (see The Schooner Freeman *v.* Buckingham, 18 Howard, 191), and the principle applies for a stronger reason to the shipping clerk of a railway, whose powers are obviously not so large as those of the captain of a ship (Coleman *v.* Riches, 16 C. B., 104).    In Hubbersty *v.* Ward (8 Excheq., 330) the Court went still further by a decision, that when the master has once signed a bill of lading for goods that have actully been shipped his power is exhausted, and he cannot charge the owner by signing a second bill for the same goods.

"These decisions seem to be eminently wise, and to have been made with the regard to consequences which should never be lost sight of in administering the law.    If the master of a vessel could render the owner answerable to the full extent of any goods, however rare or costly, that the hold could contain, a prudent man would hardly send a ship to sea without accompanying her as supercargo and limiting the authority of the captain to the navigation from port to port.    In like manner the position of a railway company would be perilous in the extreme if they could be charged with a liability that might extend to millions, by collusion between consignors and the shipping clerks, or other persons who are necessarily deputed to receive and forward freight.

"It is, however, contended on behalf of the plaintiffs that, as the contract was made in New York, it must be governed by the law of that state as laid down in Armour *v.* The Michigan Central Railroad Company (65 New York, 111), where Grant *v.* Norway was disapproved, and railway companies said to be estopped from questioning receipts signed by their agents, as against third persons who have given value in the belief that they are real.    The decision is irreconcilable with the *ratio decidendi* in Freeman *v.* Buckingham, although the court essayed to distinguish the case on the ground that the goods were by the terms of the bill of lading deliverable to the order of the consignee and not to the consignor's.    Without entering on the inquiry whether a contract, made in one state for the transportation of goods through it, and their delivery in another, depends on the law of the place where the bill of

lading is executed, or the law of the place where the goods are to be delivered, it seems to be clear that regard 'must be had in this instance to the law of the state of New York.

".The question is not as to the meaning or interpretation of the agreement, about which there is no dispute, nor whether the company would have been bound had the bill of lading been directly executed by them, but was the shipping clerk authorized to sign the bill of lading in the absence of the goods?

"The powers of an agent and the manner in which they are to be exercised obviously depend on the law of the place where he is appointed and his duties are to be fulfilled, and it is not less clear that the law of New York must be sought in the decisions of her courts as it regards points not arising under the Constitution and laws of the United States. It has indeed been said of late years that the rules laid down in the state courts for commercial transactions, by such names as KENT, WALWORTH, TILGHMAN, and GIBSON, though acquiesced in for half a century by the mercantile community, and sanctioned by the general assent which gives usage the force of law, may be disregarded by the courts of the United States, if they are not, in the opinion of those courts, consistent with the commercial law, which should theoretically be the same throughout the civilized world, but is in fact different on either side of the English Channel, and even in capitals which, like London and Edinburgh, obey the same Parliament. (See Swift *v.* Tyson, 16 Peters, 1; Carpenter *v.* The Providence Insurance Company, Id., 495; Watson *v.* Tarpley, 18 Howard, 517; Oates *v.* The National Bank, 10 Otto, 245.) This view is attended with consequences that are peculiar, and have not perhaps been sufficiently observed. The United States are not forbidden to impair the obligation of contracts, and there is consequently nothing to preclude the Federal tribunals from invalidating an agreement that has been entered into on the faith of the principles enunciated in one judicial decision, by another which discloses the error of its predecessor, or comes nearer to absolute truth. It has accordingly been decided by the Supreme Court of the United States that, while the United States has no power to regulate the internal commerce of the several states, and such an attempt by the legislature or the Executive would be unconstitutional, the Judiciary of the United States may interpret the commercial law of a state as they deem expedient, even when the effect is to annul contracts based upon the prior decisions of the state courts, and growing out of instruments which, like a policy of insurance, are not ordinarily regarded as commercial. (Swift *v.* Tyson, 16 Peters, 1; Carpenter *v.* The Providence Insur-

ance Company, Id., 495; Watson v. Tarpley, 18 Howard, 517; Oates v. The National Bank, 10 Otto, 245.) But the same august tribunal has decided that the state courts are under like circumstances bound by their prior judgments, as it regards intervening contracts, and cannot constitutionally rectify an error however manifest, at the expense of a plaintiff or defendant who has taken it for truth. (See Gelpcke v. Dubuque, 1 Wallace, 175; Olcott . v. The Supervisors, 16 Id., 678; Louisiana v. Pilsbury, 15 Otto, 278, 292.) Nothing is better established in the Court of Chancery or at common law than that taking land or chattels as a collateral *security* for a pre-existing debt, does not render the creditor a purchaser for value in the absence of an express or implied agreement for forbearance, although time is actually given in reliance on the means of payment so obtained. (Petrie v. Clark, 11 S. & R., 371; Dickerson v. Tillinghast, 4 Paige, 215; Garrard v. The Railroad Company, 5 Casey, 154; Ashton's Appeal, 23 P. F. S., 153, 162; Morse v. Godfrey, 3 Story, 364, 390; 2 Leading Cases in Eq., 83, 4th Amer. ed.; Clark v. Flint, 22 Pick, 231.) Such also is the long-established rule of the law merchant, as interpreted in Pennsylvania and New York, in accordance with the earlier English precedents (Bay v. Coddington, 5 Johnson, Ch. 54), and when the question was considered in Goodman v. Simonds (20 Howard, 343, 371) it was treated as open to discussion and one where the usage of each locality might be followed consistently with principle. Yet in the recent case of Oates v. The National Bank (10 Otto, 245), the court went out of its way to intimate that in determining whether such a transfer will free a promissory note from antecedent equities, they will not be guided by the law of the state where the instrument is made or negotiated.

"In Watson v. Tarpley (18 Howard, 521), a bill which had been drawn in Mississippi on New Orleans, in the state of Louisiana, was presented for acceptance and dishonored, and a suit instituted against the drawer in the Circuit Court of the United States for the Southern District of Mississippi; and it was held by the Supreme Court on a writ of error, that a Mississippi statute providing that a recovery should not be had on such instruments before maturity, nor until after presentment for payment, must be disregarded, not because foreign bills are governed by the *lex loci solutionis*, nor because they are within the power to regulate commerce with foreign nations and among the states, reasons which might have been more or less valid, but because a statute which sought to render the right of a non-resident holder dependent on presentment, protest and notice of non-payment 'would be a violation of the . . . . . general commercial law which the state

would have no power to impair,' an argument which would have been not less applicable to a promissory note or bill of exchange made and payable within the state.

" In these instances the court asserted the right to impose an obligation, where by the state law as defined antecedently to the making of the contract, none exists; but in Carpenter v. The Providence Insurance Company (16 Peters, 495), the effect was to impair an obligation, which agreeably to the New York and Massachusetts cases would have been valid. The suit was brought on a policy of insurance which seems to have been executed in Rhode Island, and might not, therefore, be governed by the law of New York, where the premises were situated, and the policy had been signed with the consent of the insurers for the protection of a mortgage; but the court took the broad ground that while the decisions of the state courts are entitled to respect, they are not authoritative and will not control the judgments of the Federal courts, even as it regards intervening contracts which have presumably been based on the rule as defined by the state judiciary.

" The result of a suit is thus made dependent not on settled legal principles, but on the accident or design which has dictated the choice of the forum, and a party who can bring or remove the case into a Federal court may obtain judgment where he would otherwise fail. Such a relation between tribunals sitting in the same territory, and professedly administering the same principles, is anomalous, and so far as I am aware unparalelled in the history of jurisprudence; but a subordinate tribunal must accept the law as it is written without considering the consequences too deeply. Conceding therefore that the shipping clerk, whose misconduct gave rise to the present controversy, could not have given a valid bill of lading under the rule laid down by the Supreme Court of the United States, in the case of The Schooner Freeman v. Buckingham, the courts of Pennsylvania are, notwithstanding, bound by the decisions of the same court not to follow that rule, and must, on the contrary, look to the precedents in New York for their guide. If, therefore, Weiss was such an agent as the case of Armour v. The Michigan Railroad Company contemplates, he must be so regarded for the purposes of this suit, and we cannot render judgment for the defendant without impairing the obligation of a contract which was presumably founded on the *lex loci contractus*, as declared authoritatively by the commission which, for the time being, constituted a court of last resort in New York.

" We are thus brought to the turning point of the controversy: What was Weiss's authority? which is a mixed question of law and fact, depending on the case stated as read in

the light of well-known principles. If he was clothed with a general power to issue bills of lading, and determine when the circumstances required its exercise, the railway company are bound by his signature to the instrument in suit, while no such conclusion can be reached if his powers were confined within narrower limits, and manifestly exceeded in what he did. (Brady *v.* Tod, 9 C. B. N. S., 592.) The term general agent is used in two different senses, which are yet in legal effect much the same; in one of them it denotes a person who, like the manager of a bank or superintendent of a joint stock manufacturing company, has charge of the entire business of his principals, and may bind them by any agreement within its scope, but it is also applicable to one who, though retained for a specific purpose, has yet a general authority relatively to that purpose, as for instance, to issue certificates of stock and determine, when the occasion requires that such an issue shall be made. (Dingle *v.* Hare, 7 C. B. N. S., 145.) It is immaterial that the powers of such an agent are subject to limitations, and ought not to be exercised save in a certain state of things, if the limitations are known only to his principal, or the agent is to determine when the condition is fulfilled. (Edmunds *v.* Bushell, L. R. 1 Q. B., 97.) In conducting the inquiry the court may consider not only what powers were actually conferred, and what were the intentions of the principal, but the impression which his conduct and language were calculated to convey to third persons, and one who is held forth as a general agent may act as such whether it be or be not his true character. The question is, nevertheless, primarily one of facts and circumstances, and until these are ascertained it is not possible to draw legal inferences.

"If we now turn to the case stated, which is our only source of information, we shall find that if not explicit it affords a sufficient ground for judgment. It is there stated that Weiss was the shipping agent of the railroad with authority to issue bills of lading. Were this all, we should presumably be obliged to hold, conformably to Armour *v.* The Railroad, that he was a general agent, and might bind his principal by an admission that goods had been received, contrary to the fact; but we also learn, that while 'the said P. J. Weiss, the shipping clerk of the defendant, was duly authorized to issue bills of lading for goods actually received, he had no authority whatever to issue the same without receiving goods therein mentioned,' and the case stated adds, 'nor had the defendant ever done or said anything to lead any one to suppose that they had authorized the said Weiss to issue bills of lading without receiving the goods therein mentioned.' This is the marrow of the controversy, and so far as I can dis-

cern makes an end of the plaintiff's case. One who has no real or apparent authority save in a contingency that has not occurred, may bind himself, but cannot enter into any engagement that will be obligatory on the person whom he represents. Every one who deals with an agent must verify his powers or take the risk; and it is not until the act in question is shown to be within their real or apparent scope that it is incumbent on the principal to show why he could not be bound: (Brady v. Todd, 9 C. B. N. S., 592.) Such is the rule laid down by Mr. Justice CURTIS, in the case already cited of The Schooner Freeman v. Buckingham, and the difference between his judgment and that rendered in Armour v. The Michigan Railroad Company, was not owing to the denial of a generally recognized principle, nor because it is at all doubtful that the delivery of the goods is a condition precedent to the execution of a bill of lading, but because the New York Court held that a shipping clerk has such an appearance of authority as will justify third persons in taking for granted that the condition was fulfilled. By an apparent authority I understand that which, whether it exists or not, may be justly inferred from the acts or language of the principal. No man can properly be held answerable save for what he says or does, and if a different rule prevailed in the case of agency it would be imprudent to employ an agent. When, therefore, it is stated as part of the plaintiff's case, not only that Weiss had no authority to issue bills of lading without receiving the goods, but that the railroad company never did or said anything to lead any one to suppose that such an authority had been conferred, we cannot avoid the inference that he had neither a real nor apparent authority to issue the bill of lading which is the foundation of the present suit.

" Judgment is therefore entered for the defendant in the case stated."

Whereupon plaintiffs took this writ assigning for error the action of the court in entering judgment as above.

*William C. Hannis*, for plaintiffs in error.—Where a corporation authorizes its agent to issue its obligation, having all the attributes of negotiability, and that agent, in the usual course of business, fraudulently issues one of those obligations, upon which money is advanced by an innocent third person, as between the innocent third person and the corporation, the corporation must bear the loss; for where one of two innocent persons must suffer by the fraud of a third, he who gave the transgressor the means of doing wrong must bear alone the consequences of the act: Mundorff v. Wickersham, 13 P. F. S., 87; Bank v. West Phila. R. R., 5 Weekly Notes, 290;

Penna. R. R. Appeal, 5 Norris, 80; Willis v. Darby R. R. Co., 6 Weekly Notes, 461; Burton's Appeal, 12 Norris, 214; Willis v. Fry, 13 Philada., 38; Xander v. Comm., 6 Out., 434. And this principle applies in New York as well as in Pennsylvania: Armour v. R. R. Co., 65 N. Y., 111; Bank v. Erie R. R. Co., 72 Id., 188; Moore v. Bank, 55 Id., 41; McNeil v. Bank, 46 Id., 325; N. Y. and N. H. R. R. Co. v. Schuyler, 34 Id., 30, 73; Griswold v. Haven, 25 Id., 595–602; Bank v. Bank, 16 Id., 125, 142; Cooke v. Bank, 52 Id., 96. By the statute law of New York, as well as of Pennsylvania, bills of lading issued by railroad companies pass by indorsement and have all the attributes of negotiability: Purd. Dig., 114, 115; Revised Statutes of N. Y. vol. 3, p. 2259 and 2260, § 6. Formerly bills of lading were mere acknowledgments of receipts of goods, having no attributes of negotiability about them, and it was upon such a contract that the English cases of Grant v. Norway (10 C. B. 665), and the line of Federal decisions following it, was decided. Then, an innocent purchaser for value stood in no better position than the original holder, but now, since these statutes importing negotiability to the bill of lading, there has entered into the contract a new element, and a railroad company issuing such an obligation in the regular course of its business, by its agent, setting forth that it has received certain goods and would transport them to the place specified, will be estopped from denying the truth of such statement: Armour v. R. R. Co., 65 N. Y., 111; Bank v. Bank, 16 Id., 125; N. Y. and N. H. R. R. Co. v. Schuyler, 34 Id., 30, 73; Lloyd v. Bank, 3 Harris, 172; Dorsey v. Abrams, 4 Norris, 299: Steckel v. Bank, 12 Id., 376; Zeigler v. Bank, Id., 393; Bank v. Aymar, 3 Hill, 262. And that, notwithstanding the fact that the agent had no actual or apparent authority to issue bills of lading without receiving the goods.

*George W. Biddle, A. Sydney Biddle,* and *J. Rodman Paul,* for defendants in error.—A common carrier is not liable upon a bill of lading fraudulently or even negligently issued by an agent, without receipt of the goods specified therein: Grant v, Norway, 10 C. B., 665; Hubbersty v. Ward, 8 Exchequer. 330; McLean v. Fleming, L. R., 2 S. C. Ap. Cases, 128. The Federal courts of this country have adopted the same rule: The Schooner Freeman v. Buckingham, 18 Howard, 182; The Lady Franklin, 8 Wallace, 325; Pollard v. Vinton, 15 Otto, 7; Robinson v. R. R. Co., 9 Federal Rep., 129. And the several state courts hold the same doctrine: Sears v. Wingate, 3 Allen, 103; Dean v. King, 22 Ohio St., 118; Railroad v. Wilkens, 44 Md., 11; Tiedeman v. Knox, 53 Id., 615; Hunt v.

Railroad, 29 La. Ann., 446; Bank v. Laveille, 52 Mo., 380·, Warden v. Greer, 6 Watts, 424; Decan v. Shipper, 11 Casey, 239; Bissell v. Steel, 17 P. F. S., 443; Trans. Co. v. Steele, 20 Id., 188; Ins. Co. v. Insley, 7 Barr, 230.  This case is governed by the law of Pennsylvania, the place of performance of the contract: Everett v. Vendryes, 19 N. Y., 436; Dike v. Erie R. R.. 45 Id., 113; Curtis v. The Railroad, 74 Id., 116; Bank v. Shaw, 2 Weekly Notes, 542; In re Conrad, 8 Philada., 147; Ludlow v. Bingham, 4 Dallas, 47.  Even if this case be governed by the law of New York, in order to sustain it, some actual or apparent authority must be shown in an agent in order to bind the principal, and in this case it is expressly set forth in the case stated—

" That while the said P. J. Weiss, the shipping clerk of the defendant, was duly authorized to issue bills of lading for goods actually received, he had no authority whatever to issue such bills of lading without receiving the goods therein mentioned, nor had the defendant ever done or said anything to lead any one to suppose that they had authorized the said Weiss to issue bills of lading without receiving the goods therein mentioned."

And this limitation of the agent's authority is as decisive as though it had been distinctly set forth in the bill of lading: 2 Redfield on Railways, § 169; Farnham v. Railroad, 5 P. F. S., 53; Express Co. v. Sands, Id., 140: Patterson v. Clyde, 17 Id., 500.

Mr. Justice STERRETT delivered the opinion of the court, October 5th, 1885.

The facts upon which the judgment of the court below is based, are all embodied in the case stated, and therefore it is unnecessary to repeat them:  In substance, however, the controlling facts are these.  Defendant is a common carrier corporation, and, at one of its stations in the state of New York, had in its employ P. J. Weiss as shipping clerk, duly authorized to issue bills of lading for goods delivered to the company for shipment over its line.  Plaintiffs, as commission merchants in Philadelphia, received over defendant's road, from F. C. Williams, of Batavia, New York, several consignments of barley, on which, from time to time, they made advances, by accepting and paying drafts drawn on them by the consignor and attached to the bills of lading signed by Weiss for and on behalf of defendant.  All the bills of lading except one represented actual consignments of barley; but that one was fictitious, having been fraudulently issued by Weiss and delivered to Williams for a carload of barley never delivered to defendant nor shipped to plaintiffs.  These facts were of course

well known to both Weiss and Williams, who conspired to commit the fraud of which plaintiffs were wholly ignorant. Williams made a draft on plaintiffs and attached it to the fraudulent bill of lading. The draft was duly presented, and, on the faith of the bill of lading, was paid by plaintiffs; but of course the pretended carload of barley never arrived. Plaintiffs, who thus became the innocent victims of the fraud to the extent of several hundred dollars, claim that defendant, through whose shipping agent they were defrauded, should make good the loss.

The claim appears to be both reasonable and just; and, notwithstanding the authorities cited in support of the opposite view, we are satisfied it is so. Under the circumstances cited in the case stated defendant is estopped from denying what its accredited shipping agent asserted in the bill of lading by which plaintiffs, without any fault on their part, were misled to their injury.

A question has been raised as to whether, upon the facts presented, the law of this state or that of New York should govern in determining defendant's liability. We are not prepared to admit there is any material difference between the laws of the two states, applicable to the case; but if there is we think it very clear that the law of New York must control, for the reason that the transaction took place in that state. It is well settled that whatever concerns the rights of parties, especially in matters of contract, is governed by the *lex loci contractus,* while the remedy, including whatever relates to the limitation of actions, etc., must be determined by the *lex fori:* 4 Minor's Inst., pp. 509, 740; Bulger *v.* Roche, 28 Mass., 36. It is said in the last case, "the authorities both from the civil and the common law concur in fixing the rule that the nature, validity and construction of contracts are to be determined by the law of the place where the contract is made; and all remedies for enforcing such contracts are regulated by the law of the place where such remedies are pursued." Applying that as the correct principle, the present case is virtually ruled by Armour et al. *v.* The Michigan Central Railroad Co., 65 N. Y., 111. The facts of that case, as stated in the opinion of the court, are not distinguishable in principle from those of the case before us. Defendant company's shipping clerk knowing it had not received from or on account of Michaels any lard whatever, issued and delivered to him certain bills of lading which were attached by Michaels to his drafts on plaintiffs, who "upon the faith that defendant had received and would transport to the places specified in the respective bills, the lard therein described to be in its possession, paid the sums specified in the respective drafts at the time and

in the order in which they were presented; and thus the question comes up whether the defendant is not estopped from setting up as a defence to this action that its statements, known by its agent at the time of making them to be untrue, were in fact false, and that no lard whatever was recieved by the railroad company for or on account of Michaels. The true answer to this question is not involved in doubt. The well recognized principle that a party who, by his admissions, has induced a third party to act in a particular manner is not permitted to deny the truth of his admission, if the consequence would be to work an injury to such third party, applies to and governs this case." Again, in another portion of the opinion, it is said, "Street, having power to issue bills direct to consignees for goods actually in the possession of defendant, and the present bills being in no way distinguishable in form from those which were usually employed, he must, as to the plaintiffs acting in good faith, be considered as having the necessary authority. . . . . . The representations in the bills were made to any one who, in the course of business, might think fit to make advances on the faith of them. There is thus present every element necessary to constitute a case of estoppel *in pais*, a representation made with the knowledge that it might be acted on, and subsequent action upon the faith of it to such an extent that it would injure the plaintiffs if the representation was not made good." The language thus employed in that case may very appropriately be applied to the present one.

The same principle is recognized in Coventry, Sheppard & Co. *v.* The Great Eastern Railway Company, 11 Law Rep., Q. B. Div., 776, the facts of which were briefly these : The railroad company received a consignment of wheat and issued therefor a delivery order which came into the hands of B., who obtained advances thereon from plaintiffs. Shortly afterwards the company issued a second delivery order in respect of the same consignment of wheat. The two orders were different, and such as might be reasonably supposed to relate to distinct consignments. On the second order B. obtained further advances from plaintiffs, who were under the belief that the delivery orders related to distinct consignments. B. having afterwards become insolvent, it was held that the company was estopped by the negligence of its agent from showing that the two delivery orders related only to one consignment, and that it was liable to compensate plaintiffs for the loss sustained by them through their advances to B.

It is contended that inasmuch as no authority, real or apparent, to issue bills of lading without receiving the goods mentioned therein, had actually been given by the railroad com-

12 OUTERBRIDGE.—35

pany to Weiss, it was not in any manner responsible for his unauthorized act, even as to innocent third parties, who were misled and injured thereby. We cannot assent to this proposition. As between principal and third parties, the true limit of the agent's authority to bind the former is the apparent authority with which the agent is invested; but, as between the principal and the agent, the true limit is the express authority or instruction given to the agent: Evan's Agency, 594, 606; Adams Express Co. *v.* Schlessinger, 25 P. F. Smith, 246. The principal is bound by all the acts of his agent within the scope of the authority which he held him out to the world to possess, notwithstanding the agent acted contrary to instructions; and this is especially the case with officers and agents of corporations. Since a corporation acts only through agents it is bound by its agent's contracts when made ostensibly within the range of their office. One who authorizes another to act for him in a certain class of contracts undertakes for the absence of fraud in the agent acting within the scope of his authority: Whart. Cont., Sec. 96, 130, 269. The authority of an agent to act for and bind his principal will be implied from the accustomed performance by the agent of acts of the same general character for the principal with his knowledge and consent: Evans' Agency, 193, note. These elementary principles are founded on the doctrine that where one of two persons must suffer by the act of a third person, he who has held that person out as worthy of trust and confidence, and as having authority in that matter, should be bound by it: Evans' Agency, 591. It is conceded in this case that the company did not authorize the issuance of bills of lading without receipt of the goods, but it put Weiss in its place to do that class of acts, and it should be answerable for the manner in which he conducted himself within the range of his agency. Public policy, as well as the ultimate good of corporations themselves, requires that this should be the rule.

> Judgment reversed and judgment, on the case stated, in favor of plaintiffs for $300.39, with interest from May 31st, 1881, and costs.