# Franklin Trust Company *v.* Philadelphia, Baltimore & Washington Railroad Company, Appellant.

*Common carrier—Carriers—Bills of lading—Forgery—Burden of proof —Evidence.*

In an action against a common carrier to recover for losses sustained in lending money on the faith of bills of lading which did not represent goods delivered to the carrier, where palpable forgeries and alterations appear on the face of the bills, and the agent of the carrier testifies that such forgeries and alterations were made after the bills had been signed by him and had left his hands, the burden is upon the plaintiff to explain such forgeries and alterations, and if he fails to do so, he cannot recover.

In such a case where there is not a particle of evidence in the case to justify even an intimation of wrongdoing on the part of the agent of the carrier or his clerk, it is uncalled for and therefore error for the trial judge to suggest to the jury that they should impute no crime to the agent of the carrier or his clerk on mere inference if they could possibly avoid it.

*Common carriers—Carriers—Bills of lading—Authority of agent— Bills issued for goods not received.*

Whether the agent of a common carrier can issue bills of lading, binding upon the carrier, for goods not received, not decided: People v. New York, etc., R. R. Co., 108 Pa. 529, explained.

A bill of lading partakes of the nature both of a receipt and a contract to carry, and in so far as it is a receipt it has always been held that it is not conclusive, but is open to explanation as between the original parties, and where the bill is marked "not negotiable" the same rule applies as to third parties.

Bills of lading do not rest on the same footing as bills of exchange or other strictly commercial paper. Their delivery or negotiation produces no greater effect than would the delivery of the goods they represent, and the right conferred by the indorsement will be limited to that which might have been exercised by the indorsee had the goods themselves been transferred, instead of the bill.

Argued March 23, 1908. Appeal, No. 399, Jan. T., 1907, by defendant, from judgment of C. P. No. 2, Phila. Co., March Term, 1906, No. 3,328, on verdict for plaintiff in case of Franklin Trust Company v. Philadelphia, Baltimore & Wash-

ington Railroad Company.   Before MITCHELL, C. J., BROWN, MESTREZAT, POTTER and ELKIN, JJ.   Reversed.

Trespass to recover damages for losses occasioned by relying on bills of exchange which represented no goods delivered by the carrier.   Before SULZBERGER, P. J.

The court charged in part as follows :

[The plaintiff claims that it was induced to believe that the accounts were true and existent, and that the buyers had got the goods, by the certificates of the defendant, that say the defendant had the goods for shipment to those respective persons, and was going to ship them, or had shipped them.   To this I do not understand that the defendant admits that it issued these receipts, but it gives no explanation of why the goods did not reach the people, except to say " we never got the goods."   Not to have got the goods is an excellent reason for not shipping them, but it is not an excellent reason for issuing shipping receipts, and why the defendant issued those receipts does not to my recollection appear in the evidence. Nobody testifies why they were given.   Though the man who signed them was on the stand in this court room, he does not explain why he gave the receipts.   It is true another man signed two of them, but these men, after all, are only the authorized expression of the company's power.   They are confessedly the agents of the company, and it is exactly as if the company itself signed the receipts, and they do not tell us why they signed the receipts.   In the absence of any explanation we have here, then, the case of the company certifying that it got the goods, and that certificate being used by the person who gets it from the company to get money from the plaintiff.

There is, however, a third class of transactions, and those are the ones to which I alluded in the beginning, when the company gave its receipt and there was no alteration.   On them the question of fact arises.

But the plaintiff contends that all these other things were taken out of his case before he laid it before the jury, and that he is now dealing with you only on the case of. the certificates that were never altered.   Respecting such certifi-

cates (if you find that this plaintiff has such certificates before you), I say to you that the defendant is liable to the plaintiff for its loss by reason of untrue certificates of shipments having been issued by it, because, as I pointed out before, there is absolutely no explanation or qualification of those certificates by the defendant. To say that it got no goods would· be a splendid reason for having issued no receipt, but, having issued the receipt, to say that it got no goods is nothing. It is absolutely without reason to say that. Can you impute to any defendant standing here a total absence of reason? No, they do not mean to stand in that bald position. What they mean to say is this : " We have issued this receipt. Somehow we never got the goods. We never would have issued it if we had not been somehow fooled, and there are only three people in the world that could have fooled us, Warnock, his clerk and Binz. Warnock and his clerk we trust. Binz must have done something, we do not know what, by which he perpetrated this fraud.

What we have here is their receipt, and no explanation of how it came, provided you do not find that these were originally rightfully issued papers and altered by Binz. You, therefore, stand in this position. If these papers were rightfully issued, issued by the company, as they appear to be, then the company is responsible for having placed in the hands of Binz a weapon of deceit with which to cheat any ordinary mortal, and that not because the paper is negotiable in any legal sense or has any element of negotiability, but because it is against common right to issue weapons of offense and place them in the hands of people with which to hurt others.] [3]

[Can you impute to any defendant standing here a total absence of reason? No. They do not mean to stand in that bald position. What they mean to do is to say this: " We have issued this receipt. . Somehow we never got the goods. We never would have issued it if we had not been somehow fooled, and there are only three people in the world that could have fooled us, Warnock, his clerk and Binz. Warnock and his clerk we trust. Binz must have done something, we do not know what, by which he perpetrated this fraud. What?] [4]

[What could Binz have done? How could Binz perpetrate the criminality of signing Warnock's name which Warnock signed himself? That is what we do not know. Warnock and his clerk both signed the names. What could Binz have done? He could have done something if Warnock and his clerk had signed a batch of these things and handed them to Binz in blank, so he could fill them up. But we cannot say that because Warnock and his clerk are innocent. He might have done something else, Warnock might have had leisure time one evening, and sat down and signed a bunch of these in blank, and locked them up in his desk, and then Binz might have committed a burglary and got them and used them afterwards, but there is no such evidence. If that had happened, they would know. Where is the evidence?] [5]

Verdict and judgment for plaintiff for $14,146.57. Defendant appealed.

*E. J. Sellers,* of *Sellers & Rhoads,* for appellant.—The agent Warnock was called by plaintiff and the latter was bound by his testimony. He testified that the receipts were true and correct when issued, but that they were subsequently altered, and, consequently, were forgeries. This testimony rebutted any inference that he had done anything wrong or had been a party to any wrong. His testimony, the only testimony of positive character, showed honesty on his part. As the altered documents referred to fictitious shipments, of course, the merchandise was never received and, consequently, defendant never became liable for such fiction.

The following case is directly in point: Roy & Roy v. Northern Pacific Railway Company, 6 L. R. A. (N. S) 302.

*Alex. Simpson, Jr.,* with him *Alfred Aarons* and *Henry N. Wessel,* for appellee.—If an agent with authority to issue bills of lading for goods received for shipment, issues such bills when no goods were in fact received, the principal is not released from all liability solely by reason of that fact: Brooke v. N. Y., etc., R. R. Co., 108 Pa. 529 ; American Car & Foundry Co. v. Water Co., 218 Pa. 542; Story on Agency, 126, 127, 443 ; Tanner v. R. R. Co., 53 Pa. 411 ; Adams Express Co. v. Schlessinger, 75 Pa. 246 ; Hubbard v. Tenbrook, 23 W. N. C. 351 ; McNeile v. Cridland, 168 Pa. 16 ; Sioux City, etc., R. R.

Co. v. Bank, 10 Neb. 556 (7 N. W. Repr. 311); Armour v. R. R. Co., 65 N. Y. 111; Bank of Batavia v. R. R. Co., 106 N. Y. 195; Sears v. Wingate, 85 Mass. 103 ; Smith v. Ry. Co., 74 Mo. App. 48 ; Tibbits v. Ry. Co., 49 Ill. App. 567 ; R. R. Co. v. Larned, 103 Ill. 293 ; Ry. Co. v. Adams, 4 Kansas App. 305.

If a nonnegotiable bill of lading is issued when no goods have been received, the defendant is liable to innocent third parties who have parted with their money in reliance upon the averments contained in the bill: Fifth Ave. Bank v. R. R. Co., 137 N. Y. 231 (33 N. E. Repr. 378); Dock v. Boyd, 93 Pa. 92; Atkins v. Payne & Co., 190 Pa. 5.

It has been many times decided, however, that at the common law, bills, while not negotiable in the same sense that promissory notes are, are none the less quasi-negotiable, run in favor of assigns, and will pass by assignment or indorsement, carrying thereby the title of the goods to the assignee or indorsee: Gates v. R. R. Co., 42 Neb. 379 ; Pollard v. Reardon, 65 Fed. Repr. 848 ; Schumacher v. Eby, 24 Pa. 521 ; Empire Transportation Co. v. Steele, 70 Pa. 188 ; Hieskell v. Bank, 89 Pa. 155 ; Bache v. Philips, 155 Pa. 103.

Indeed, it has also been repeatedly said that title thereto, and to the goods named in the bill, will pass by delivery of the bill, without assignment or indorsement, if such appears to have been the intention : Holmes v. Bailey, 92 Pa. 57; Holmes v. Bank, 77 Pa. 525 ; Richardson & Co. v. Nathan, 167 Pa. 513 ; Sloan v. Johnson, 20 Pa. Superior Ct. 643.

OPINION BY MR. JUSTICE POTTER, June 23, 1908 :

The record in this case discloses a most unusual state of affairs.  It appears that the factory of the R. E. F. Binz Carpet Corporation was located at Glen Riddle, Pa., and its manufactured product was shipped on the railroad of the defendant company, from Glen Riddle station.  The method of shipping was as follows : When goods were ready for delivery to the railroad, to be transported, the consignor made out a shipping order, containing a description of the articles to be shipped, the name of the consignee, and the destination.  This was handed to the agent of the common carrier to be retained by him.  The agent of the railroad then made out and signed and gave to the shipper a bill of lading intended to be for-

warded to the consignee, and supplied also a memorandum copy of the bill of lading which was intended to be retained by the shipper.  As a matter of precaution, and of easy identification, the railroad company had the shipping orders printed on blue paper, the bills of lading upon white paper, and the memorandum copies of the bills of lading upon pink paper.  The bills of lading bore the words " Not Negotiable " plainly printed across the ends, and were not negotiable instruments.  It appears further that the common practice is for the shipper to fill up the shipping order, and the blanks in the bill of lading and its copy in advance, and by the use of carbon paper inserted between the pages the three papers can be filled out at one and the same writing; the bill of lading and its memorandum copy requiring the signature of the agent of the common carrier to complete them.   In the present case the Binz Carpet Corporation sold its goods upon a credit of three or four months' time, and in the course of its business it arranged with the plaintiff, the Franklin Trust Company, to borrow money from it, by assigning to it the accounts of its customer and procuring an advance thereon.   In arranging for the loans, a statement of the account would be made out upon the bill head of the corporation, and an assignment of the account would be placed upon the sheet, with a notice that it was payable to the Franklin Trust Company.   And as evidence that the goods which were the subject of the account had been actually shipped to the customer, the carpet corporation would, according to the testimony of the president of the trust company, turn over to the trust company the original bill of lading and the memorandum copies thereof; and the original bills of lading were, it is said, generally forwarded to the consignees with a notice that the account had been assigned to and was payable to the trust company.

The plaintiff states that between October 17 and December 23, 1905, it loaned in this way the sum of $12,771.70 to the carpet corporation, relying upon the shipping receipts as evidence of the shipment by the carpet corporation of the goods which were made the basis of the accounts.   The shipping receipts were nonnegotiable, and the trust company did not depend upon them to retain title in itself to the goods; for it sent the receipts at once to the consignees, and relied for its

security as to the loan upon the financial standing of the carpet corporation, and the consignees of the goods from whom payment of the accounts was to come. No satisfactory explanation is found in the testimony as to why there should have been such long delay, from October until January, upon the part of the trust company in obtaining acknowledgments from the consignees of the assignments and of the correctness of the accounts and of their acquiescence in the transfer. It will be seen that the use of the bills of lading in this case was very different from that of the ordinary commercial transactions in which bills of lading representing shipments of goods are attached to a sight draft, which must be accepted or paid before the bills of lading are turned over to the consignee, and where neither title to nor possession of the goods can be had without the transfer of the bills of lading. In such case the bill of lading is regarded as the symbol of the goods or property and as the real security for the money advanced, and the credit of the consignee does not enter into the transaction. But here the bills of lading were only regarded by the trust company as evidence that the goods had been received for transportation by the common carrier, and the bills of lading were at once forwarded to and surrendered to the consignee with the expectation that the goods would be at once delivered to them upon arrival, although a considerable term of credit was yet to elapse before payment for them was to be made by the consignee.

Some time in the month of January, 1906, the plaintiff discovered that no goods for which these receipts or memorandum copies of the bills of lading purported to have been given, had ever been delivered to the defendant company for shipment, and that the papers in question were fraudulent and represented purely fictitious shipments. The carpet corporation was found to be insolvent, and R. E. F. Binz, its president and treasurer, who had used the bills of lading to aid his fraudulent purpose in procuring the loans, committed suicide. The trust company then brought this action against the railroad company to recover the amount of its loss, occasioned by the loans it made on the credit of the accounts supposed to have been created by the shipment of the goods set forth in the fraudulent bills of lading.

At the trial of the case counsel for defendant company asked for binding instructions in its favor upon the ground, among other things, that the receipts upon which suit was brought were forgeries made by Binz, the treasurer of the carpet corporation. The request was refused and the case was submitted to the jury, who found a verdict for the full amount of the plaintiff's claim, with interest.

The court below also overruled a motion for judgment non obstante veredicto, and discharged a rule for a new trial and entered judgment upon the verdict. The defendant company has appealed, and in its third, fourth and fifth assignments has complained of error in certain portions of the charge of the trial judge. And in the sixth assignment error is alleged in the refusal to enter judgment for the defendant non obstante veredicto.

A careful examination of the record and of the testimony and of the exhibits in this case, has satisfied us that the trial judge entirely failed to appreciate the significance of the evidence. He certainly could not have personally examined the papers offered in evidence as alleged memorandum copies of the bills of lading, or he would not, as he did in his charge, have placed the burden upon the defendant company of explaining palpable forgeries and alterations which appear upon the face of the papers. For instance, he says : " The plaintiff claims that it was induced to believe that the accounts were true and existent, and that the buyers have got the goods, by the certificates of the defendant, that say the defendant had the goods for shipment to those respective parties and was going to ship them or had shipped them. To this I do not understand that the defendant makes any reply." This statement indicated a serious misunderstanding of the situation. The agent of the defendant company testified that all shipments as made were noted in his manifest book, and that the memorandum copies of the bills of lading which were shown to him at the trial were false, in so far as they differed from the entries in the manifest book. He also testified that in some of the memorandum copies which were offered in evidence the figures were raised in amount over those which were upon the paper as it was signed by him. Notwithstanding this explanation by the agent as to the fact and the manner in which

the memorandum copies were altered and turned into forgeries, the court goes on to tell the jury that the agent had given no explanation as to why he gave the receipts. It was not the place of the agent to explain these alterations in the memorandum copies. He had testified clearly that alterations were made and figures were raised in the papers after they had been signed by him and had left his hands. In such a case the burden was clearly upon the plaintiff to explain these matters, and the jury should have been so instructed, and, if any comment were to be added, it should have been to call the attention of the jury to the fact that the plaintiff had failed to explain the alterations, and that, unless it did so, there could be no recovery. It is true that in other portions of the charge the trial judge intimated that the jury might find that the papers, when originally issued, were rightful, and that they were afterwards altered by Binz, but he dealt so much at arm's length with this aspect of the case that the effect of the charge, as a whole, upon the minds of the jurors must have been to impress them with the idea that the duty of explanation of the alterations was upon the defendant company or its agent. Then the learned judge goes further in his charge than the testimony warrants, in his suggestion to the jury that they should impute no crime to the agent of the defendant company or to his clerk on mere inference, if they could possibly avoid it. There was no excuse whatever for putting the matter in this way, for there is not a particle of evidence in the case to justify even an intimation of wrongdoing on the part of the agent or his clerk; and, on the contrary, Binz, the treasurer of the corporation, was conclusively shown to be a rogue.

Counsel for appellee admits that Binz did perpetrate fraud upon the trust company in many of the accounts assigned, but he contends, and the testimony of the president of the trust company is, that the fraudulent papers were not included among the list of those for which recovery in this case was obtained. But this is clearly a mistake. The recovery was for the full amount of all the items contained in the schedule, marked exhibit " A," and aggregated the sum of $12,771.70, and this amount, with interest, was the verdict awarded by the jury, and it includes many of these altered and raised pa-

pers. A detailed examination of the alleged memorandum copies of the bills of lading offered in support of these items shows in many, if not in most of them, the most glaring and palpable instances of fraudulent alteration of figures in the numbers of the articles written into the paper, and above the signature of the agent of the defendant company. In all these cases the burden was upon the plaintiff of showing just how and when, and by whom, these alterations were made. It is apparent that the only satisfactory way to do this would be to produce the original bill of lading in each case, and the shipping order, and compare them with the alleged memorandum copy to see if all three of the papers agreed; for, according to the testimony, they all having been made at the same time, and with carbon paper, the shipping order, bill of lading and memorandum copy should have agreed precisely. If there was a difference it was for the plaintiff to explain.

An inspection of the alleged memorandum copies of the bills of lading, and in some instances of the alleged original bills of lading, attached to the accounts which are made the basis of this suit, reveals many transparent and palpable changes. Thus the figure 1 is sometimes altered into a figure 7; sometimes into a 9, and sometimes into a 4, and in one case by adding a tail to it, into a 5. Again the figure 1 is inserted before the figure 5, turning 5 into 15; again the figure 2 is inserted before a 5, thus raising the amount from 5 to 25; again an 0 is inserted after the figure 5, thus multiplying it by 10, and changing it into 50. In the majority, if not in all of the items going to make up this schedule, for which recovery was here obtained, alterations of one kind or another seem to have been made, and they were so palpable that the burden of explanation and of comparison with the original bill of lading and shipping order was certainly upon the plaintiff. We can only account for the failure of the trial judge to place the burden in this respect where it belonged, upon the supposition that he did not make any personal examination of the alleged memorandum copies of the bills of lading offered in exhibit " A."

The third, fourth and fifth specifications of error are sustained.

Of course, if the bills of lading upon which this suit is based,

were all forged or altered, they are invalid and no recovery whatever can be had. But another question is raised in this case, and that is as to the effect upon the liability of the defendant company, of nonnegotiable bills of lading, in the hands of a third party who was misled by them, and where the bills of lading were issued through the negligence or mistake of the agent, when no goods were actually delivered to the company for transportation. It is contended by counsel for appellee that in such case, the defendant company would be estopped from showing that no goods were in fact received for transportation, and in support of this view the decision in Brooke v. New York, etc., R. R. Co., 108 Pa. 529, is cited. In that case, however, it does not appear that the bill of lading was nonnegotiable, but at any rate the transaction arose in the state of New York, and the decision avowedly followed and was controlled by the law of New York. But the view taken of this question by the courts of New York is directly opposed to the overwhelming weight of authority which holds that the master of a vessel or the agent of a common carrier has no authority to issue bills of lading for goods which have not been received. And that as a consequence if the agent of the carrier fraudulently or inadvertently issues a bill of lading for goods which have not been received, he cannot be considered as acting within the scope of his authority, and the bill of lading so issued is void. The decisions of the English courts are uniformly to this effect, and hold that even as against a bona fide consignee or indorsee for value, the carrier is not estopped by the statements of the bill of lading issued by the agent, from showing that no goods were in fact received for transportation. The same rule applies in Canada, and it is the established doctrine of the supreme court of the United States and of the federal courts, and in many of the state courts. There has been much conflict over this question, but over and over again it has been pointed out in the decisions that a bill of lading partakes of the nature both of a receipt and a contract to carry; and in so far as it is a receipt, it has always been held that it was not conclusive, but was open to explanation as between the original parties. In the present case, the bills of lading were not negotiable instruments; the defendant company took the pains to limit its responsibility as

regards third parties, by printing across the bill the notice that it was "Not Negotiable." But, aside from that fact, bills of lading do not occupy the position of bills of exchange or other commercial paper. This court, speaking by Thompson, C. J., in Empire Transportation Co. v. Steele, 70 Pa. 188, said: "Lord Loughborough in Mason v. Lichbarrow, 6 East. 21, delivering the opinion of the Exchequer Chamber, held that the indorsement of bills of lading had never been regarded in the commercial law as resting on the footing of bills of exchange or other strictly commercial paper; that inquiry was a duty, and consequently that the indorsee took such paper on the credit of the indorser. So is the case of Kingsford v. Merry, 11 Exch. 577. In the Mechanics' Bank v. New York & New Haven R. R. Co., 13 N. Y. 599, and in Mower v. Peabody, 13 N. Y. 121, the same thing is contained, in the principle announced that as a bill of lading is a mere symbol, its delivery or negotiation produces no greater effect than would the delivery of the goods it represents, and that the right conferred by the indorsement will be limited to that which might have been exercised by the indorsee had the goods themselves been transferred, instead of the bill." And in the opinion of the supreme court of the United States, in Friedlander v. Texas, etc., Ry. Co., 130 U. S. 416, it is said: "Bills of exchange and promissory notes are representatives of money, circulating in the commercial world as such, and it is essential, to enable them to perform their peculiar functions, that he who purchases them should not be bound to look behind the instrument, and that his right to enforce them should not be defeated by anything short of bad faith on his part. But bills of lading answer a different purpose, and perform different functions. They are regarded as so much cotton, hay, iron or other articles of merchandise, in that they are symbols of ownership of the goods they cover."

In Bank of Batavia v. N. Y., L. E. & W. R. R. Co., 106 N. Y. 195, speaking of the liability of the common carrier upon a bill of lading, the court says (p. 200): "If he desires to limit his responsibility to the named consignee alone, he must stamp his bills as 'nonnegotiable;' and where he does not do that he must be understood to intend a possible transfer of the bills, and to affect the action of such transferees."

This would seem to be an intimation that the New York courts would not hold the carrier estopped from showing the truth with regard to the nondelivery of the goods when a bill of lading stamped "not negotiable" was found in the hands of a third party.   But, however that may be, in view of the fact that this case is to go back for another trial, we have called attention to these authorities in order that the decision in Brooke v. New York, etc., R. R. Co., 108 Pa. 529, may not be regarded as declaring the law of Pennsylvania.   It is conclusive only as to its own facts, and as applying to them the law of the state of New York, where the transaction occurred. It is not to be regarded as decisive of the law of Pennsylvania in a case where by mistake or fraud a nonnegotiable bill of lading is issued, when no goods have been received for shipment and the bill of lading is transferred to third parties.   In such case the question is to be regarded as at least an open one in Pennsylvania.   In the present case the judgment of the court below is reversed, and a venire facias de novo is awarded.