| 95 | 152 |
|----|-----|
| 131 | 124 |

| 95 | 152 |
|----|-----|
| 202 | 609 |

| 95 | 152 |
|----|-----|
| d 29 SC | 25 |

## Creveling *versus* Wood & Leman.

C., a manufacturer of railroad and bar iron, wrote to W. & L.: "In reply to your application to be appointed, selling agent for the Glendower Iron Works, I will agree to appoint you my selling agent for the sale of my railroad iron, merchant bar and muck bar, for New York and eastern markets, provided you will agree to exert yourselves to keep the mill employed, and give me the preference and refusal of all orders that may come to you. In compensation for such service I will agree to allow you a commission, on all sales of railroad iron and muck bar in your district, of one and one-half per cent. (1½), out of this percentage you to pay all extra commissions to other brokers." On the same day W. & L. wrote on the face of this letter, "Terms and conditions of this agreement accepted." W. & L. negotiated a sale of 4500 tons of rails to a railroad company, but only 646 tons were delivered, as the company through its embarrassments was unable to pay for more. W. & L. claimed to recover commissions on the whole 4500 tons, and in a suit therefor the court below instructed the jury that the right of the plaintiffs to compensation did not depend upon the quantity of railroad iron delivered, but upon the amount which was sold through the agency of the plaintiffs; that if the latter brought the defendant and the purchaser together, and "there was an act of sale or purchase passing from one to the other, the one agreeing to do and the other accepting, this constitutes a sale so far as the agent employed is concerned, who when he has gained the mutual assent of the minds of the person who desires to purchase and of him who desires to sell, has then performed what he agrees to perform, and has earned his percentage." *Held*, that this was error; that plaintiffs were not acting in the capacity of brokers of the defendant, but as agents to sell under a special agreement, and that the sales contemplated in said agreement were actual sales in a commercial sense and not mere contracts to sell.

June 11th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

Error to the Court of Common Pleas of *Montour county:* Of May Term 1880, No. 44.

Assumpsit by George R. Wood and Benjamin B. Leman, partners, under the name of Wood & Leman, against Alfred Creveling, to recover commissions for the sale of certain railroad iron.

Creveling, who is a manufacturer of railroad iron and other bar iron at the Glendower Iron Works in Danville, Pennsylvania, on the 19th of July 1877, appointed Wood & Leman, who were then iron brokers in the city of New York, his agents for New York and the eastern markets. His contract with them was made in New York, by the following letter and acceptance of terms, viz:

"New York, July 19th 1877.

Messrs. Wood & Leman,
            Gentlemen :
                    In reply to your application to be appointed selling agent for the Glendower Iron Works, I will appoint you my selling agent, for the sale of my railroad iron, merchant and muck bar for New York and eastern markets, provided you will agree to exert yourselves to keep the mill employed, and give

[Creveling v. Wood & Leman.]

me the preference and refusal of all orders that may come to you. In compensation for such service, I will agree to allow you a commission, on all sales of railroad iron and muck bar in your district, of one and one half per cent. (1½), out of this percentage, you to pay all extra commissions to other brokers. In the event of any sales being made through the instrumentality of C. M. Schott, then it is agreed, that the commission of (1½) per cent. shall be equally divided between yourselves and him. Commission to be allowed only on the net price at the mill. Commission on all merchant bar in the same district sold to be seventy-five cents per ton. This agreement to continue in force until annulled by giving sixty days notice to either party.

Yours, &c.,

A. CREVELING."

Wood & Leman accepted these terms by writing upon the face of this letter, "New York, July 19th 1877. Terms and conditions of this agreement accepted. WOOD & LEMAN;" and the agreement continued in force until the 20th of February 1878, when it was terminated by a written notice for that purpose from Creveling to Wood & Leman served on the 20th December 1877.

While Wood & Leman were the agents of Creveling, they introduced him to William S. Williams, a director and agent of the Covington, Columbus and Black Hills Railroad Company; and considerable negotiation then took place between Creveling, assisted by Wood & Leman on the one side, and Williams on the other, in regard to the manufacture of railroad iron by Creveling and its sale to the railroad company. Creveling made an offer in writing, dated September 4th 1877, to furnish 4500 tons of railroad iron of the therein specified weight, lengths and quality and of the pattern agreed upon; not less than 200 tons to be delivered at Chicago per week, at $34.50 per ton, provided the freight would not exceed $4 per ton, each 200 tons to be paid for on delivery, and presentation of invoice and bills of lading to W. S. Williams, 26 Pine Street New York. Proposition to be accepted on or before the 20th of September 1877. On the 20th of September 1877 Wood & Leaman made two copies of a memorandum of an agreement between Creveling and the railroad company, which they called "bought and sold notes," which differed from Creveling's offer among other things, in requiring that 300 tons should be delivered each week, and in stipulating that the payments should be made by drafts on Williams payable three days after sight. They sent one copy to the president of the railroad company to be signed by him, and the other to Mr. Creveling for his signature. The latter refused to assent to these changes in the contract, but interlined the copy of the memorandum sent to him, so as to make it correspond to his proposal of September 4th 1877, and signed it thus altered, and

sent it to Wood & Leman. They gave it to Williams and received from him the copy signed by the president of the railroad company as drawn by them, Wood & Leman, and without being altered so as to correspond with the copy signed by Creveling; and, by letter dated the 8th of October 1877, stated to Creveling that the changes would have to be sent to Sioux City for formal acceptance, but that Williams said he should go on and commence making rails, as the company must have 2000 tons before winter. Creveling commenced making the rails which he charged to Williams at $30.50 per ton delivered at Danville. He delivered 646 tons, the last of which was delivered before the 5th of November 1877, and he was paid for this iron each week for the amount then delivered, by means of sight drafts on Williams, which the latter paid. Creveling made some 300 tons more but before they were delivered, viz. on the 10th of November 1877, he was directed by Wood & Leman, at the instance of Williams, to withhold drafts and shipments, until he, Williams, should return from Chicago. It was then discovered that the railroad company was embarrassed and could not pay for any more rails, and no more were made for them, the 300 tons on hand being sold to other parties.

At the trial before Elwell, P. J., the plaintiff submitted the following point, to which is subjoined the answer of the court.

The court are requested to charge the jury that if they find from the evidence that Wood & Leman effected a sale of 4500 tons of railroad iron for the defendant, to the railroad company, and bought and sold notes were exchanged between said Creveling and said company evidencing said sale, the plaintiffs thereupon became entitled under the provisions of the agreement between them and the said Creveling, of the date of July 19th 1877, to their commissions on the net amount of said sale—that is, on the price of the iron at the defendant's mill in Danville, and are entitled to recover the same in this action unless the said commissions have been paid by the defendant or released by plaintiffs for a sufficient consideration.

Ans. "I affirm that point as the law of the case."

The first point of the defendant with the answer of the court was as follows:

That under the written contract of July 19th 1877, by which the plaintiffs became the selling agents of the defendant, the plaintiffs are not entitled to charge a commission on the price of 4500 tons of railroad iron agreed to be made by the defendant for the railroad company, but only on so much of said railroad iron as was actually sold by the defendant to the said railroad company—that is, under the evidence in this cause, on the iron made and delivered to the said company or its agent.

Ans. "I decline to affirm that point. In what I have already said in the general charge it is apparent to you that the law is, as we hold it to be, that the right to compensation does not depend

upon the amount of railroad iron delivered, but upon the amount which was sold through the agency of the plaintiffs."

In the general charge the court, inter alia, said :

" The contract in this case is evidenced by a writing dated on the 19th of July 1877, signed by one party and an acceptance written upon it by the other. * * * There is a passage in it which I would like to refer to, however.  On the part of the defendant it was proposed to the plaintiffs in the words following : ' In compensation for such service (after stating what the service was), I will agree to allow you a commission on all sales of railroad iron and muck bar iron in your district of one and one-half per cent. ; out of this percentage, you to pay all extra commissions to other brokers.' That phraseology requires us, in construing this contract, to ascertain what is meant by the words, ' all sales of railroad iron.'

" Where technical terms are used, they are to have the interpretation given by law to the particular word, unless there be something in the character or nature of the contract which would really control the general significance of a technical term, but we are to consider the relative situation of the parties and the subject-matter of the contract, in order to understand what the parties meant ; for it is their intention which is sought for in giving construction to a writing.  Where they have in express and clear terms indicated and put upon record their whole meaning, it is not open to construction because it speaks for itself.  But in many instances it is necessary to consider facts and circumstances, the relation of the parties and the subject-matter of the contract, in order to understand what the parties have meant by the terms which they have used.  As applied to the business of an iron broker, an agent in a city who sells a large amount of property like railroad iron, a question arises whether the word ' sale' is to be considered in its technical sense, as the transfer of an article existing at the time in a shape capable of being handed over directly and immediately to the purchaser, or whether it relates to the transfer of the future produce of the vendor.  What is generally understood in cases of that kind ? Suppose a man who has a large dairy agrees in the spring of the year to sell the product of his farm, his entire dairy, how would that be understood ? that it was a sale of each and every particular cheese, and would amount to no sale unless there were cheeses then existing ?  True, it would not pass the title to the particular article at the time of making the contract ; but if one man should employ another to make a sale of his dairy for him, promising him (say) a hundred dollars if he would do so, when this employee has brought a purchaser, accepted by the dairyman and their contract is complete, I apprehend, according to the usual understanding and common parlance, a sale has been effected, at least so far as regards the agreement between the dairyman and his agent.  Such is my understanding of the word ' sale' used in this contract.'

[Creveling *v.* Wood & Leman.]

" [I hold, therefore, that if the jury find that a contract was made, a purchaser was found for Creveling for the product of his mill, that Creveling and this purchaser were brought together by their writings, that there was an act of sale or purchase passing from one to the other, the one agreeing to do, and the other accepting, this constitutes a sale so far as the agent is concerned ; who, when he has gained the mutual assent of the minds of the person who desires to purchase, and of him who desires to sell, then performed what he agreed to perform and has earned his percentage. No responsibility rests upon the broker, acting as an agent, for the solvency of the purchaser to whom his employer has contracted to sell. No stipulation as to delivery is binding upon him after the contract. In fact, without improperly interfering, he could do nothing more than to accomplish the sale satisfactorily to his employer."]

Verdict for plaintiffs for $1442.54 ; and after judgment thereon defendant took this writ and alleged that the court erred in the answers to the above points (2d and 3d. assignments), and in the portion of the charge in brackets. (1st assignment.)

*Grier & Hinckley* and *Joshua W. Comly,* for plaintiff in error.—Wood & Leman were simply agents to sell iron for Creveling. He designated them as agents in his letter. They are not governed by the law of real estate brokers. The letter shows that the understanding of the contract was that commissions were only to be paid for iron sold and paid for. They were to receive commissions on actual sales, not on contracts for sales. A sale in law is a contract by which the property is passed. Here only 646 tons were delivered.

*Edward H. Baldy & Son,* for defendants in error.—Wood & Leman were iron brokers, and when they had brought the parties together and found for Creveling a purchaser for 4500 tons of rails, and Creveling had sold the same, their duties were at an end, and they were entitled to their commissions on the 4500 tons : Story on Agency, sect. 28 ; 2 Kent's Com. 622, 4th ed. ; Keys *v.* Johnston, 18 P. F. Smith 42 ; Inslee *v.* Jones, Bright. Rep. 78. It was not intended that Wood & Leman should join the duties of factors with that of brokers. They were employed as brokers only. They were employed to sell, not to deliver, or do any other act in reference to the execution of the contract. When they had made a sale and disclosed their principal, their whole duty was done. When the principal is disclosed, the broker is no longer authorized to alter the terms of the contract on the ground that the moment a sale is made he is *functus officio ;* Long on Sales 398.

Mr. Justice PAXSON delivered the opinion of the court, June 19th 1880.

The radical error of this case is to be found in that portion of the charge embraced in the first assignment of error, and involves the construction of the letter of the defendant below to the plaintiffs under date of July 19th 1877. The plaintiffs having accepted the terms of said letter by an endorsement thereon, we must look to it as embodying the agreement of the parties. The effect of it was to make the plaintiffs "selling agents" for the defendant for the sale of his "railroad iron, merchant and muck bar for New York and eastern markets," upon certain conditions therein named, and for an agreed compensation "on all sales." Under this appointment the plaintiffs alleged that they had sold forty-five hundred tons of iron for the defendant to the Covington, Columbus & Black Hills Railroad Company. A contract in writing between the defendant and the railroad company was prepared for the sale of said iron, the due execution of which was, however, denied by the defendant. This point we regard as unimportant. The defendant delivered six hundred and forty-six tons of iron to the company, when a further compliance with the contract on his part was prevented by the inability of the company to make payments. The plaintiffs claimed a right to recover commissions on the whole forty-five hundred tons; the defendant denied any liability beyond the six hundred and forty-six tons.

The learned judge instructed the jury that the right of the plaintiffs to compensation did not depend upon the quantity of railroad iron delivered, but upon the amount which was sold through the agency of the plaintiffs; that if the plaintiffs brought the defendant and the purchaser together, and "there was an act of sale or purchase passing from one to the other, the one agreeing to do, and the other accepting, this constitutes a sale so far as the agent employed is concerned, who, when he has gained the mutual assent of the minds of the person who desires to purchase, and of him who desires to sell, has then performed what he agrees to perform, and has earned his percentage." This is in almost the language of Inslee v. Jones, Bright. R. 76, and Keys v. Johnston, 18 P. F. Smith 42, in which it was held that "brokers are persons whose business is to bring buyer and seller together; they need have nothing to do with the negotiation of the bargain." This language was applied in a case where a real estate broker had brought suit to recover his commissions. If the present claim had been by a broker for commissions on the sale of real estate, the ruling of the court would have been accurate. But this was a case of merchandise, and the plaintiffs were not acting in the capacity of brokers of the defendants. They were agents to sell under a special agreement. The sales contemplated in said agreement were actual sales in a commercial sense, not mere contracts to sell. A

[Creveling *v.* Wood & Leman.]

sale is " a transfer of the absolute title to property for a certain agreed price. It is a contract between two parties, one of whom acquires thereby a property in the thing sold, and the other parts with it for a valuable consideration :" Story on Sales, sect. 1. There was no sale here beyond the six hundred and forty-six tons. There was a mere contract to sell. The iron was not even made. If the plaintiffs were entitled to commissions on the contract to sell, they had earned commissions on the entire forty-five hundred tons the moment the contract was entered into. No claim, however, was made for commissions on the undelivered iron until after the matter fell through by reason of the inability of the purchaser to pay. This portion of the claim was evidently an afterthought. The parties to the agreement regarded it as a contract for commissions on actual sales. On the 15th of December 1877, more than a month after the last iron had been delivered, the plaintiffs sent to the defendant their bill for services to that time, in which they claimed one and a half per cent. on the six hundred and forty-six tons delivered, and made no claim for percentage on the residue of the forty-five hundred tons. The construction placed upon their agreement by the parties themselves at the time they were acting under it, was the proper one. There can be no recovery for commissions on the forty-five hundred tons beyond the amount actually sold and delivered.

What has been said covers the first, second and third assignments and renders the fourth unimportant.

•   Judgment reversed, and a *venire facias de novo* awarded.