Warren M. WILSON

v.

HOMESTEAD VALVE MANUFAC-
TURING COMPANY.

Appeal of Warren M. WILSON.

Appeal of HOMESTEAD VALVE MANU-
FACTURING COMPANY.

Nos. 11329, 11330.

United States Court of Appeals
Third Circuit.

Argued Oct. 12, 1954.

Decided Dec. 15, 1954.

Joseph S. D. Christof, Pittsburgh, Pa. (Henry A. Craig, McCloskey, Best & Leslie, Pittsburgh, Pa., on the brief), for appellant and appellee.

Clyde A. Armstrong, Pittsburgh, Pa. (C. M. Thorp, Jr., Joseph E. Madva, Thorp, Reed & Armstrong, Pittsburgh, Pa., on the brief), for Homestead Valve Mfg. Co.

Before MARIS, GOODRICH and KALODNER, Circuit Judges.

MARIS, Circuit Judge.

The plaintiff, Warren M. Wilson, a resident of Ohio, brought a civil action in the United States District Court for the Western District of Pennsylvania against his former employer, Homestead Valve Manufacturing Company, a Pennsylvania corporation, to recover compensation which he alleged was due him for services rendered as a district sales manager. The defendant manufactures valves and jennys, including an apparatus which it calls a Hypressure Jenny. The plaintiff was employed by the defendant from the time of his graduation from Carnegie Institute of Technology as a mechanical engineer in 1935 until March 18, 1942. He worked at first in the engineering department, during which time for a short period, he performed the duties of a district sales man-

ager in the defendant's eastern territory. In the latter part of 1938 the plaintiff became district sales manager for the eastern territory for the sale of Hypressure Jennys and later for the sale of valves to steel mills. P. L. Rhodes, formerly the district sales manager for the eastern territory for all of the defendant's products, thereafter retained jurisdiction only over the sale of valves to accounts other than steel mills. Rhodes left the defendant's employ during the latter part of 1939.

On February 1, 1940, the plaintiff took over the duties of district sales manager for all of the defendant's products for the eastern territory under a written agreement which set forth his duties and his compensation consisting of a base salary of $250.00 each month and a bonus which was to be prorated over the last eleven months of 1940. On January 30, 1941 the defendant mailed to the plaintiff a credit memorandum showing $1,346.89 bonus due him on 1940 sales and attached thereto a proposed 1941 contract, dated January 30, 1941. This proposed agreement set forth the plaintiff's duties in the same terms as they were stated in the 1940 agreement and provided for the same base monthly salary and bonus, to be prorated over the twelve months of 1941. The contract thus offered was accepted by the plaintiff and it is upon it that the present action was based. The contract provided as follows:

"January 30, 1941
Memo to Mr. W. M. Wilson
Re: Salary & Bonus Agreement
Superceding all previous agreements, you will on February 1st:

1. Take over the direction of sales of Homestead Valves and Hypressure Jennys in the complete Eastern Territory comprising New England States (New York west to Syracuse), New Jersey, Pennsylvania west to and including Harrisburg, Delaware, Maryland, District of Columbia, and Virginia.

2. Place and direct Manufacturers Agents in the New England (Boston) area, New York area, Philadelphia area, and later in the Albany, New York area. These agents are exclusive automotive Jenny agents.

3. Follow up industrial Jenny leads, secure data for Surveys from these leads and close them.

4. Demonstrate and instruct Agents to demonstrate Hypressure Jenny to prospective customers.

5. Develop multiple Jenny sales.

6. Visit Valve Agents and customers, dividing your time approximately equally between Valve and Jenny sales work.

Your territory shall be covered once every six weeks.

Your itinerary shall be given us in advance and detailed reports on Agents and customers visited shall be sent us promptly.

Your financial arrangement with Homestead Valve Manufacturing Company is:

1. A base salary rate of $250 a month starting Jan. 1st, 1941.

2. A bonus consisting of the difference between salary and selling expense, and the aggregate yearly earnings from Valve and Jenny sales in your territory on the following basis: [1]

4% on the first $60,000 net volume of sales

5% on the next $30,000 net volume of sales

6% beyond $90,000 net volume of sales

The above to be pro-rated for the twelve months of 1941.

We will pay you 30% of the total commission available on all industrial Jennys sold direct and without commissions

[1.] The defendant had a practice of dividing commissions on sales of valves and jennys into three equal parts: one part was credited to the territory in which the order was given; a second part was credited to the territory in which the sales engineering work was done; and the remainder to the territory to which the product was shipped for delivery to the customer.

allowed Jobbers or as discounts. Direct Sales will not be included in your annual bonus set up.

Also, we will allow 15% of the list price of a unit to Jenny Manufacturers Agents in industrial sales Jenny sales in their territory and you will receive 20% of the remaining commission. These sales will not be included in your annual bonus set up.

It is further agreed that when it seems feasible to the officers of the Homestead Valve Manufacturing Company and W. M. Wilson that the New England and New York territory (exclusive of New York City area) may be divorced from your territory and turned over to another District Sales Manager for the sale of both Valves and Jennys.

This agreement may be cancelled by a 30-day written notice by either party."

The plaintiff continued to serve as district sales manager under the agreement of January 30, 1941. On February 12, 1942, he came to defendant's plant to settle his bonus credit for the year 1941. He was handed a paper entitled "W. M. Wilson Bonus Set Up 1941" which showed the following computation:

| | |
|---|---:|
| "Sales | $267,410.44 |
| Less—Direct Sales | 903.10 |
| | $266,507.34 |
| 4% .... to.... $60,000 ... $ | 2400.00 |
| 5% .... to.... 30,000 ... | 1500.00 |
| 6% on $176,507.34 ........ | 10590.44 |
| | $14490.44 |
| Salary & Expenses ........ | 4929.19 |
| | 9561.25 |

*Maritime Sales*

| | |
|---|---:|
| $43,392.64 at 6% .......... | 2,603.56 |
| | $12,164.81" |

The General Manager, F. E. Schuchman, informed plaintiff that his territory had booked approximately $1,200,000 worth of business and at 6% that represented $72,000 bonus and announced "we are not going to pay it." The plaintiff nonetheless claimed it. Shortly thereafter the defendant gave the plaintiff written notice that his employment would be terminated in 30 days, the effective date being March 18, 1942.

In his complaint the plaintiff asserted that he was entitled under the contract to bonus in the amount of $79,398.26, with interest, computed upon the gross volume of orders for valves and jennys booked by the defendant in the eastern territory from January 1, 1941 to March 18, 1942 and shipped during 1941 and thereafter. The defendant denied that the plaintiff was entitled to any bonus credit on shipments made after the termination of his employment contract even though the shipments were upon orders booked prior thereto. The defendant also denied that the plaintiff was entitled to bonus credit on sales of manifold valves manufactured for government agencies or on the sale of 150 Hypressure Jennys shipped for export to England. A master, appointed by the court, examined the defendant's books and records and reported computations of bonus due in accordance with the theories of each party. Trial was then had to a jury.

The report of the master, which was received in evidence, showed that the total amount of shipments (except those described in Questions Nos. 3 and 4 hereafter mentioned) after January 1, 1941 of all products on orders received by the defendant from the plaintiff's territory between February 1, 1940 and March 18, 1942 amounted to $1,551,863.-42.[2] Total net shipments, including manifold valves and all other products, on these orders from January 1, 1941 to March 18, 1942, the termination date of the plaintiff's employment, amounted to $526,962.48 on which the net bonus, less salary and selling expenses, amounted to $23,084.75. Total net shipments on these orders made after the termination date, March 18, 1942, and up to

2. $179,104.41 of this amount was allotted to other territories. See note 1, supra.

1947, amounted to $845,796.53 on which the bonus would be $50,747.79. The bonus on the shipments up to March 18, 1942 referred to in Questions Nos. 3 and 4 amounted to $6,492.66 and on the portion of these shipments made after March 18, 1942 the bonus would be $5,041.84.

Both parties asked for binding instructions which the trial judge denied. The trial judge submitted to the jury the following four questions which set forth the principal issues in the case:

"Number 1: Is the Plaintiff, Warren Wilson, entitled to a bonus credit on shipments made after March 18, 1942, the date of termination of the Plaintiff's employment contract with the Homestead Valve Manufacturing Company, the Defendant, on orders received by the Company before that date?

"Number 2: Did the Plaintiff and Defendant by their contract dated January 30, 1941, which is Plaintiff's Exhibit No. 1 intend to include within the words, 'Homestead Valves' or 'Valves' which words appear in that contract the 'Special Welded Steel Manifold Valves' thereafter ordered by the U. S. Navy; and the 'Special Cast Steel Manifold Valves' thereafter ordered by the U. S. Maritime Commission?

"Number 3: Is the Plaintiff entitled to a bonus based upon the parts for manifold valve assemblies manufactured and shipped by the Defendant Company as a sub-contractor for National Radiator Company of Johnstown, Pennsylvania under contract with the U. S. Maritime Commission; the shipment by Defendant to National Radiator Company at New Castle, Pennsylvania appears on Schedule 4 of the Report of Norbert F. Stanny, the Master.

"Number 4: Is the Plaintiff entitled to a bonus based upon the shipment of 150 Hypressure Jennys purchased for the British Purchasing Commission through the War Department, Quartermaster Corps, Holabird Quartermaster Depot, Baltimore, Maryland and shipped to the British Ministry of War Trans-

port in New York City for export to England?"

The jury rendered a verdict in favor of the plaintiff and answered all four questions in the affirmative. The trial judge thereupon entered a judgment in favor of the plaintiff in the amount of $132,136.84, representing bonus totalling $85,367.34 plus interest thereon in the amount of $46,769.50 computed from the dates the bonus should have been paid. Costs were taxed against the defendant but the trial judge deferred taxing the master's fee. The defendant then filed a motion to modify or set aside so much of the judgment as was in excess of $13,965.10, the sum it admitted to be due the plaintiff under the contract, or in the alternative to grant the defendant a new trial. Before this motion came on for argument the trial judge died and it was accordingly heard by another judge of the district court.

In determining the issues presented by the motion, the court concluded that Questions Nos. 2, 3 and 4 were rightly submitted to the jury and that their affirmative answers were sustained by the evidence. The court decided that Question No. 1, which asked whether the plaintiff was entitled to bonus credit on orders placed with the defendant prior to March 18, 1942 but shipped thereafter, should not have been submitted to the jury. The court found that the construction of the employment contract in respect to this question was not a matter within the province of the jury and that the trial judge should have decided the question in the negative as a matter of law. The court viewed the contract as not being ambiguous or of doubtful meaning and that its construction involved only a question of law. Accordingly the court eliminated from the judgment all bonus credit on shipments made after March 18, 1942, thus reducing the amount of bonus included in the judgment to $29,577.41. The district court also concluded that, considering the nature of the claim and the fact that it was unliquidated, it would be just and equi-

table to allow no interest for any period prior to the date of entry of the original judgment. Accordingly it reduced to $3,549.28 the amount of interest included in the judgment. The master's fee in the amount of $4,900.00 was taxed against the defendant and the award of costs to the plaintiff was undisturbed. Each party thereupon appealed to this court.

The plaintiff on his appeal contends that the district court erred in reducing the amount of the judgment previously entered upon the jury verdict and in awarding interest only from the time of entry of judgment. The defendant upon its appeal asserts that the district court erred in submitting Questions Nos. 2, 3 and 4 to the jury and in entering judgment against it on the basis of the jury's affirmative answers. Its contention is that the court should have answered each of these questions in the negative as a matter of law. It also contends that it was error to tax the master's fee against it and to award costs to the plaintiff.

■■ In determining the rights of the parties in this diversity case, the district court sitting in Pennsylvania was obliged to follow the conflict of laws rule of Pennsylvania, which is that, generally, the law of the place of contracting is to be applied in interpreting contracts.[3] And where that state is also the place of performance its law will unquestionably be applied.[4] Since Pennsylvania was both the place of contracting and of performance in the present case it is the law of that state which is applicable.

■ Under the law of Pennsylvania the compensation to which the plaintiff was entitled depends upon the language of the employment contract, construing it as a whole, and gathering from the four corners of the contract the mutual intention of the parties. In order to ascertain that intention, "the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement." Slonaker v. P. G. Publishing Co., 1940, 338 Pa. 292, 296, 13 A.2d 48, 50–51. The court must look to what the parties have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.[5] It is a settled rule that where a contract contains no words pertaining to an art or trade, is written in plain and popular language, and the facts and circumstances attending its execution and delivery are wholly undisputed, the interpretation is for the court, not for the jury.[6] But if a provision in a written contract is of doubtful or ambiguous meaning, the court looks to the practical construction given to the contract by the parties as evidenced by their course of dealing under it.[7]

■ With respect to the defendant's contention that Questions Nos. 2, 3 and 4 should not have been submitted to the jury we think that the language of the contract was sufficiently ambiguous with respect to the subject matter of these questions to call for recourse to the surrounding circumstances and acts of the parties and thus to justify the posing of the questions to the jury. While there was some evidence to the contrary our examination of the record discloses such an abundance of evidence in support of the jury's affirmative answers as to render further discussion of these issues unnecessary. We need merely say that

3. Brooke v. New York, L. E. & W. R. Co., 1885, 108 Pa. 529, 544, 1 A. 206, 208.

4. State Bank of Chicago v. King, 1914, 244 Pa. 29, 31, 90 A. 453.

5. Moore v. Stevens Coal Co., 1934, 315 Pa. 564, 568, 173 A. 661, 662.

6. Baldwin v. Magen, 1924, 279 Pa. 302, 123 A. 815; Com. to Use of Herzog v. Henry W. Horst Co., 1950, 364 Pa. 403, 405–406, 72 A.2d 131, 133.

7. Peoples Natural Gas Co. v. Braddock Wire Co., 1893, 155 Pa. 22, 25, 25 A. 749, 750; Alpha Claude Neon Corp., for Use of Pittsburgh Outdoor Advertising Co., v. Pennsylvania Distilling Co., Inc., 1936, 325 Pa. 140, 143, 188 A. 825, 826. See Restatement, Contracts, § 235(e) and Pennsylvania Annotations thereto.

these three questions were properly submitted to the jury and that its answers, supported as they were by sufficient evidence, were rightly applied by the district court in computing the amount of the judgment rendered in favor of the plaintiff.

A more difficult problem and indeed the crucial issue in the case is that raised by the plaintiff's contention that the court erred in setting aside the jury's affirmative answer to Question No. 1 and in reducing the amount of the judgment originally entered so as to eliminate all bonus with respect to sales in which the shipments were made after the termination of the plaintiff's employment. This the court did upon its conclusion that the contract was neither ambiguous nor of doubtful meaning on this question. Considering that the issue presented was purely one of law the court concluded that under the language of the agreement the question must be resolved in favor of the defendant's contention, namely, that sales involving such subsequent shipments were not to be considered as sales for bonus purposes.

■ The plaintiff's first contention upon this issue is that the written contract should as a matter of law have been construed to entitle him to bonus on all sales in his territory where the orders were obtained prior to the termination of his employment even though deliveries thereunder were made thereafter. For this proposition he relies on the general rule, which is followed in Pennsylvania, that ordinarily a person employed to sell personal property is entitled to his commission when he obtains an order which is accepted by his employer. But the terms of the contract do not support plaintiff in the position that he was a commission salesman within the meaning of this rule with respect to the sales here involved. On the contrary it is clear that he was to be primarily a sales manager not a salesman. Thus he was to "Take over the direction of sales", to "Place and direct Manufacturers Agents", to "instruct Agents to demon-strate Hypressure Jenny to prospective customers" and to "Visit Valve Agents and Customers". True, he was also to "Follow up industrial Jenny leads, secure data for Surveys from these leads and close them", to "Demonstrate * * * Hypressure Jenny to prospective customers", and to "Develop multiple Jenny sales". But the contract expressly provided that the plaintiff should receive fixed commissions on all industrial jennys sold by him direct without discounts or jobbers' commissions and on industrial jenny sales through manufacturer's agents and that these sales "will not be included in your [the plaintiff's] annual bonus set up". It will thus be seen that to the extent that the plaintiff's duties called for direct selling he was to be compensated by a commission wholly apart from the salary and bonus provided for by the contract. The Pennsylvania cases which the plaintiff cites in support of his contention do not sustain it since they involve persons who were employed primarily to sell and not, as in the plaintiff's case, to supervise selling by others.

The plaintiff next urges that even if the general rule of law above referred to is not applicable to his case nonetheless the word "sales" as used in the paragraph of the agreement relating to the computation of the plaintiff's bonus is of such doubtful and ambiguous meaning as to require interpretation in the light of the circumstances and practices of the parties. It is the plaintiff's contention that if it is not clear from the contract itself that the word "sales" as used in that paragraph means orders booked regardless of when delivered then it was proper for the trial judge to submit to the jury the question whether under the evidence as to the circumstances and practices of the parties that was the meaning which was intended. This was in essence Question No. 1 which the trial judge submitted to the jury and which they answered in the affirmative. Asserting that the question was properly submitted and that the jury's affirmative answer was supported

by the evidence the plaintiff urges that the court erred in setting the answer aside, construing the contract as unambiguously restricting the plaintiff's bonus credit to sales delivered during his employment, and amending the judgment accordingly.

We find ourselves in agreement with the final conclusion of the district court on this question. We may assume, without deciding, that the meaning of the word "sales" in the contract is not so clear as to exclude the necessity of recourse to evidence as to the circumstances and conduct of the parties to throw light upon the meaning intended by them. For when we look at the contract in the light of that evidence the necessary conclusion is that the parties intended by the contract that the plaintiff should receive bonus computed only upon the net volume of deliveries made during the term of his employment as district sales manager.

Looking at the contract itself we see that the plaintiff was not a salesman but a managing executive officer of the defendant. He was to receive a compensation for his services as such consisting of a fixed salary plus a "bonus" representing the difference between the total of his salary and selling expense and the "aggregate yearly earnings" from sales in his territory, based upon fixed percentages of "net volume of sales". It would seem reasonable that the bonus payable to such an executive should be computed on completed business rather than on orders some of which might never be completed by delivery. It would, therefore, seem likely that the "sales" referred to in the agreement were intended to be sales completed by delivery and the issuance of invoices, that is, actual sales in a commercial sense, rather than orders booked, which are merely contracts to sell in the future. The case of Creveling v. Wood & Leman, 1880, 95 Pa. 152, is persuasive in this connection. And see Newhall v. Victor Box Mfg. Co., 1921, 269 Pa. 545, 113 A. 59.

But when we leave the text of the agreement itself and consider the evidence of the parties' intention in this regard as shown by the circumstances and their practices under the agreement we are compelled to reach the conclusion that they intended by "sales" to refer to deliveries not to orders. For the plaintiff's own testimony establishes that it was the practice from the outset for his bonus to be computed on deliveries rather than on booked orders. He admitted that in 1940 his bonus was computed solely on shipments made during the last eleven months of that year including shipments on some orders booked previously under the managership of his predecessor, Rhodes. All of the other relevant evidence corroborates this. The uncontradicted evidence shows that it was the established practice of the defendant to treat shipments as "sales" for bonus purposes. Copies of the invoices of shipped goods were currently sent to the plaintiff and it was on the total of these invoices that his bonus credit was computed. Moreover the plaintiff does not now claim bonus credit on those orders on which shipment was never made.

At the trial the defendant requested the trial judge to instruct the jury as follows:

"Under the law and all the evidence in this case, including the written contract of January 30, 1941 (Plaintiff's Exhibit No. 1), Plaintiff is not entitled to any compensation based upon any shipments made after March 18, 1942 on orders for such sales dated prior to March 18, 1942."

This request was denied. For the reasons already stated we are satisfied that the instruction should have been given and that Question No. 1, which involved the same problem, should not have been submitted to the jury. The court was therefore right in setting aside the jury's answer to that question and concluding that the plaintiff was entitled to bonus credit only upon sales completed by shipment during his tenure of office.

The plaintiff's final contention is that the district court erred in eliminating from the judgment all inter-

est for periods prior to its date of entry. We look to the law of Pennsylvania with regard to this problem.[8] Although the question here involved has not been squarely passed upon by the courts of Pennsylvania, it would seem that interest is allowable as of right in a case such as the one here involved. In West Republic Mining Co. v. Jones, 1884, 108 Pa. 55, 68, the Supreme Court said:

> "The defendants admit indebtedness to the plaintiffs. A dispute has arisen respecting the performance of the contract by the plaintiffs, and the amount of the debt, but however determined, the debt arises from contract. * * * Interest shall be allowed in all cases of contract where it is the duty of the debtor to pay money without a previous demand by the creditor."

This principle was followed in McCornack v. Sharples, 1916, 254 Pa. 541, 99 A. 155, a case involving a claim for royalties for the use of an invention. In that case the court directed the allowance of interest from the dates when payment should have been made of royalties found by the court to be due. The court said, 254 Pa. at page 543, 99 A. at page 155:

> "It is a sound principle, equally applicable in equity or at law, that one who retains money, after it is justly due and payable to another should pay interest for the detention. We are therefore of opinion that McCornack was entitled to interest upon the royalties retained by Sharples after they were due, and that the referee was not justified in withholding it."

It is true that the claim was in a sense unliquidated until judgment, as the district court held. But, as the Supreme Court of Pennsylvania said in Carbondale City School Dist. v. Fidelity & Deposit Co. of Maryland, 1943, 346 Pa. 491, 493, 31 A.2d 279, 280, "The requirement that the claim be liquidated is not strictly applied in certain situations of obvious necessity, notably in actions for accounting for royalties and other profits." And see J. Purdy Cope Hotels Co. v. Fidelity Phenix Fire Ins. Co., 1937, 126 Pa. Super. 260, 191 A. 636. We think that the situation involved in the present case is a comparable one and that the judgment should have included interest on the unpaid bonus due the plaintiff from the dates when it should have been paid.[9]

■ But little need be said with respect to the defendant's contentions that the master's fee and the plaintiff's costs should not be taxed against it. This action was clearly proper under Fed.Rules Civ.Proc. rules 53(a), 54(d), 28 U.S.C.A. The appointment of the master to report upon the defendant's sales was proper and indeed necessary. The substantial recovery realized by the plaintiff in excess of the amount admitted by the defendant to be due fully justifies the taxation of these items against the defendant.

■ In closing this opinion we desire strongly to commend the trial judge, the late Judge Owen M. Burns, for making use of the services of a special master to examine the records of the defendant and report in summary form the significant figures for the use of the trial judge and the jury. This efficient procedure unquestionably shortened and simplified the trial, which otherwise might well have gotten bogged down in a welter of figures. Likewise his use of interrogatories was very wise. For they not only greatly simplified the task of the jury in this complicated case but also made it possible for the district court on motion and for this court on appeal to review and modify the judgment originally entered without having to order a new trial which without the answers to the interrogatories would have been necessary. We commend this salutary practice to the

8. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477.

9. The defendant stated in its brief in this court that the bonus for the year 1941 was due on January 1, 1942, and that the bonus for that portion of the year 1942 during which the plaintiff was employed was due on March 18, 1942. This would appear to be correct.

district courts for use in appropriate cases. See Skidmore v. Baltimore & O. R. Co., 2 Cir., 1948, 167 F.2d 54, certiorari denied 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371; Cate v. Good Bros., 3 Cir., 1950, 181 F.2d 146, certiorari denied 340 U.S. 826, 71 S.Ct. 62, 95 L.Ed. 607; Bank of Nova Scotia v. San Miguel, 1 Cir., 1952, 196 F.2d 950.

The judgment of the district court will be vacated and the cause will be remanded with directions to enter a new judgment modified by the inclusion of interest as directed in this opinion. The plaintiff shall have costs in this court on both appeals.