In re **INDUSTRIAL CAR MANUFAC-TURING CO. (Previously Mass Transit Systems Corp.) and Easton Car Corporation, Debtors.**

**Bankruptcy No. 78–599EG.**

United States Bankruptcy Court,
E. D. Pennsylvania.

Nov. 28, 1979.

---

Leonard J. Cook, Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., for claimant.

Robert A. Kargen, White & Williams, Philadelphia, Pa., for debtor.

Adelman & Lavine and Lawrence J. Lichtenstein, Philadelphia, Pa., for Creditors' Committee.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue before us arises out of the debtor's objections to claims for commissions and vacation pay filed by one Nicholas Guilbert ("Guilbert"), pursuant to an employment contract between Guilbert and the debtor. Guilbert's first claim (No. 48), is for $24,443.75, consisting of $480.75 vacation pay and $23,963.00 for commissions due on certain sale orders. His second claim (No. 49), is for a $5,500.00 administrative expense, pursuant to Section 64(a)(1) of the Bankruptcy Act. The latter claim is for commissions on a contract with Chemico Air Pollution Control Company. Guilbert claims that this amount is entitled to priority as an administrative expense because of his efforts in negotiating a compromise agreement with Chemico after the Chapter XI proceedings commenced. We will hold that Guilbert is entitled to have both claims allowed as general unsecured claims in the total amount of $23,003.75.

Easton Car Corporation ("the debtor") designs and manufactures specialized material handling cars. In August of 1973, Guilbert was hired as the debtor's sales manager. The terms of his employment agreement were set forth in a letter to Guilbert dated August 23, 1976, which provided that he was to receive an annual salary of $25,000.00, certain fringe benefits, and commission as provided in an attached memorandum. The memorandum provided:

Effective January 1, 1975 and thereafter, the following Sales Commission Policy is in effect:

1. On all first-time orders, either single units or multiples; either a new customer's first order or a new product to a new or old customer ..... 2%

2. On all second-time orders for essentially the same item as previously purchased by the customer ..... 1%

3. For all orders after the second order for essentially the same item as purchased the first and second time ..... ½%

The appropriate percentage will be applied to the total sales price and will be paid at time of shipment.

The intermediate percentage (1%) recognizes that less sales effort is usually required on a repeat order. Examples— the recent MACK–PACK order and the pending U.S. Metals order.

The minimum percentage (½%) provides the incentive to perform the administrative functions with the customer to keep matters flowing monthly. A good example here is the wheel and rim business with MACK.

As has been the policy in the past, advances can be made prior to shipment if desired by the sales person responsible for getting the order.

On May 2, 1978, the debtor filed a petition for an arrangement under Chapter XI of the Bankruptcy Act.

I.

Claim 48 is for commissions on twenty-six first-time orders, nine second-time orders and an unspecified number of third-time orders, along with vacation pay. The commissions due for the second-time orders are admitted by the debtor. The present controversy involves nine of the first-time orders, all of the third-time orders and the vacation pay. Easton claims that no commission is due on the following first-time orders:

1. ITT Grinnell Corporation job Nos. 76U122, 76U126 and 76U128, for which commissions of $460.00 are claimed.

2. Chemico Air Pollution Control Co. job No. 77U20, for which a commission of $2,262.00 is claimed.

3. CF & I Steel Corporation job No. 77U87, for which a commission of $3,673.56 is claimed.

4. Danieli of America Corporation job Nos. 76U45, 76U171 on which a commission of $533.54 is claimed.

5. Weirton Steel Corporation job No. 77U137, for which a commission of $4,500 is claimed.

6. St. Regis Paper Company job No. 78U118, for which a commission of $327.90 is claimed.

7. Foster-Wheeler Energy Corporation job No. 78U30, for which a commission of $873.50 is claimed.

8. Mack Truck, Inc. job No. 78U48, for which a commission of $1,016.68 is claimed; and

9. Dravo Corporation, no job number, for which a commission of $6,940.00 is claimed.

The debtor first contends that the original employment contract as evidenced by the letter of August 23, 1973, was modified and superceded by an oral agreement between Guilbert and Leon Kopyt, the debtor's president. By the terms of the alleged modification agreement, the amount of commission due on a given contract would vary, depending upon the amount of general and administrative expenses and profit realized and the risks involved. The debtor contends that Kopyt's decision as to whether any commission was due and in what amount was to be final.

■ Under Pennsylvania law, written contracts may be modified by subsequent oral agreement provided consideration is present. *Stoner v. Sley System Garages*, 353 Pa. 532, 46 A.2d 172 (1946). The burden of proving the modification is upon the party asserting it. *M.S. Jacobs & Associates v. Duffley*, 452 Pa. 143, 303 A.2d 921 (1973). The debtor's evidence in support of its contention consists of the testimony of Kopyt that Guilbert had agreed to the modification and had accepted reduced commissions on several orders. While Guilbert conceded that he had discussed some commissions with Kopyt on several orders, he did not acknowledge that the original agreement was modified thereby. We agree.

■ An oral contract modifying a prior written agreement must be proved by evidence which is clear, precise and convincing. *Pellegrene v. Luther*, 403 Pa. 212, 169 A.2d 298 (1961). From the evidence presented, we are unable to conclude that the parties intended to modify the original agreement. Of the twenty-six claims for commissions on first-time orders, fourteen are uncontested. In light of the fact that there were no profitable contracts during Kopyt's term as the debtor's president, this is certainly inconsistent with a modification agreement whereby the amount of commissions due, if any, depended upon the contract's profitability. The fact that Guilbert, himself, provided for commission of less than two percent in the cost estimate sheets for certain first-time orders is not of consequence. This fact only indicates that a reduced commission was contemplated for certain orders. It does not establish that an agreement existed whereby the commission could be reduced on any order without Guilbert's prior consent.

■■ We also note that a contract of that nature, even if proven, would be unenforceable. The rate of compensation must be clearly established before an employment contract can be enforced. *Kassab v. Ragnar Benson, Inc.*, 254 F.Supp. 830 (W.D. Pa., 1966). Therefore, unless Guilbert agreed to accept a reduction in commission on a given sales order, he is entitled to the full amount of commission specified in the letter of August 23, 1973.

■ The debtor next contends that Guilbert is not entitled to commissions on the ITT Grinnell and Danieli of America orders because they represent changes in contracts ("change orders") booked prior to Guilbert's term of employment. Whether a commission is due on such orders depends upon the construction given the word "order" in the original contract. Where a provision in a written contract is ambiguous, a court should look to the practical construction

given to the provision by the parties as evidenced by their course of dealing under it. *Wilson v. Homestead Valve Manufacturing Company*, 217 F.2d 792 (C.C.A.3, 1954). The term "order" in the present contract is sufficiently ambiguous to require us to look to the practical construction given it by the parties.

The debtor refers to no specific instance where commission was denied for a change order, but Kopyt did testify as to the circumstances under which Guilbert would be entitled to a commission. As the debtor's sales manager, Guilbert was in charge of all marketing and advertising activities of the company. Customers were referred to him by sales representatives who were under his supervision. The customer would then submit specifications for the needed car. Guilbert usually negotiated and prepared a proposal, stating the specifications and the price, which was then submitted for the customer's approval. If the customer approved of the proposal he would place an order. Kopyt testified that if Guilbert had negotiated and prepared the proposal, he would be entitled to a commission. He also stated that if Guilbert had been responsible for the original proposal, he would be entitled to a commission on the change order. Since customers were referred to Guilbert by the sales representatives, it is evident that he performed the same tasks with regard to change orders as he did with initial orders. We think it is unlikely that, under these circumstances, the parties intended that Guilbert's commissions would depend upon whether he had negotiated the initial contract. Therefore, Guilbert's claims for commissions on change orders will be allowed.

As for the Chemico Air Pollution Control order, the debtor claims that this was an existing proposal before Guilbert began working for the debtor and, therefore, he is not entitled to any commission. The original inquiry received by the debtor from Chemico was dated September 1, 1976, and Guilbert's exhibits indicate that he began to work on the proposal within two weeks after that date. Chemico did not

place its order until February of 1977. We conclude that the evidence more than adequately establishes that Guilbert negotiated and prepared the proposal and is therefore entitled to a commission thereon.

The debtor also contends that Guilbert is not entitled to a commission on the CF&I Steel contract because the job was completed after he resigned. Under Pennsylvania law, a person employed on a commission basis to solicit sales orders earns his commission when the order is accepted. The fact that payment is postponed to the date of shipment does not affect his entitlement to commission when earned. *Marcin v. Darling Valve & Manufacturing Co.*, 259 F.Supp. 720 (E.D.Pa., 1966). Guilbert's employment agreement provided that commissions would be paid for sales orders rather than contracts. Although payment was to be made at the time of shipment, advances against commissions could be secured if desired. We think it obvious that a commission was to be paid to Guilbert when the order was accepted. The fact that he was the debtor's sales manager, rather than a salesman, and received a salary in addition to his commissions, does not change this result. The language of the contract clearly indicates that a sales contract need not be completed for a commission to be due.

The next contested part of Guilbert's claim for commissions is based on an order from the Weirton Steel Corporation. Guilbert's claim is for $4,500.00, the amount he provided in his cost estimate sheet for a contract price of $931,405.00. Guilbert and Kopyt agreed, however, that the contract proposal should quote a price of $807,000.00 and this was the price at which Weirton Steel placed an order which was accepted by the debtor. During the Chapter XI proceedings, the contract was terminated and a sell-back agreement for completed portions of the contract was negotiated for a price of $658,000.00. Although it is apparent that the parties contemplated a reduced commission when the price of $807,000.00 was reached, no actual commission was agreed upon. The parties simply agreed at that time to "work something out" in the

future. Since no agreement as to commission ensued, Guilbert is entitled to the $4,500.00 provided in his cost estimate sheet.

■ Finally, the debtor argues that Guilbert is not entitled to commissions on orders by the St. Regis Paper Company, Foster-Wheeler Energy Corporation, Mack Truck, Inc., and Dravo Corporation since these orders were cancelled by the purchasers after the commencement of the Chapter XI proceedings. The fact that the orders were cancelled is irrelevant, however, since the obligation to pay commissions arose at the time the orders were accepted. *Marcin v. Darling Valve & Manufacturing Co., supra.*

■ The Dravo Corporation order presents an additional issue. The debtor contends that the order was never accepted and, therefore, Guilbert is not entitled to a commission. Kopyt testified to that effect. Guilbert contends otherwise and submits Dravo's written order of April 21, 1978, as evidence. The order stipulates, however, that acceptance must be acknowledged by signing and returning the attached acknowledgment copy. From the testimony of Guilbert and this letter, we are unable to conclude that the debtor accepted the offer. Guilbert's claim for a commission on that order, therefore, will not be allowed.

■ As for the third-time orders, the debtor claims that Guilbert is not entitled to commissions because these orders were routinely handled by other administrative personnel. The debtor contends that, since Guilbert did not negotiate or prepare the proposals personally, he is not entitled to commissions. We disagree. It is uncontroverted that Guilbert had supervisory responsibility over all marketing activities and advertising. We do not think that it was intended that Guilbert's commissions would depend on whether he personally negotiated and prepared a proposal. The debtor also objects to the claim for a commission on the Bethlehem Steel Co. contract, a third-time order, since it was cancelled by the buyer after the Chapter XI

proceeding was filed. Since, as noted above, a commission was due when the order was accepted, the subsequent cancellation was irrelevant.

■ The debtor also objects to that part of Gilbert's claim which is for vacation pay, but offers no evidence in support of its objection. Bankruptcy Rule 11–33 states that Rule 301 shall apply in Chapter XI proceedings. Rule 301 states in part

(b) *Evidentiary Effect.* A proof of claim executed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

Under this rule, the burden of proof is shifted to the debtor. Unless it produces evidence to rebut the claim, the claim should be allowed. *In re Friedman*, 436 F.Supp. 234 (D.C.Md., 1977). Therefore, since the debtor failed to produce evidence rebutting that portion of the claim, it will be allowed.

The final issue to be resolved in Claim 48 is whether Guilbert is entitled to priority for $600.00 of his claim pursuant to Section 64(a)(2). 11 U.S.C. § 104(a)(2). That section provides:

The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be

\* \* \* \* \* \*

(2) [W]ages and commissions, not to exceed $600 to each claimant, which have been earned within three months before the date of the commencement of the proceeding, due to workmen, servants, clerks, or traveling or city salesmen on salary or commission basis, whole or part time, whether or not selling exclusively for the bankrupt; and for the purposes of this clause, the term "traveling or city salesman" shall include all such salesmen, whether or not they are independent contractors selling the products or services of the bankrupt on a commission basis, with or without a drawing account or formal contract . . .

Several of Guilbert's claims for commission, which total in excess of $600.00, arose within the three months which preceded the filing of the Chapter XI petition. The remaining question is whether Guilbert falls within the categories of persons to which the statute applies. The factors to be considered were set forth in *In re Ko-Ed Tavern*, 129 F.2d 806, 809 (C.C. A.3, 1942).

> In determining whether a particular claimant falls within the category of "workman, servants, clerks, or . . . salesman . . ." general rules for testing the right to priority have evolved under court decisions. Thus it has been held that only those who work, labor, or serve in more or less subordinate capacities can be included within the statutory prescription. This rule naturally developed, as the words of the statute have been given their common, everyday and popular meaning. But there may also be other matters for consideration, such, for instance, as the character of the work performed, or the degree of authority or discretion vested in the employee. And where a claimant has served in both supervisory and subordinate capacities, his status as a wage worker may depend upon which of his activities constituted his "principal service." While the active officers or managers of a corporation are not entitled to priority as wage claimants, mere "dummy" directors and even officers or managers who were in fact employed and earned wages as "workmen, servants, clerks, or . . . salesmen . . ." of the bankrupt are not precluded from claiming a right to priority of payment. Necessarily, application depends to a large extent upon the facts of each case. In any event, the fundamental criterion is the relationship the claimant bore to the bankrupt. *In Re Progressive Luggage Corporation*, 34 F.2d 138 (C.C.A.2). [footnotes omitted].

It is clear that not every employee of a debtor is entitled to wage priority since only certain types (workmen, servants, clerks and salesmen) are mentioned in § 64a(2). Congress, it would seem, attempt-

ed a division of the weak from the strong on a job classification basis and gave a priority position to subordinate type positions: *In re Gay & Sturgis* (D.Mass., 1916) 233 F. 604. Employees in executive type positions have been excluded from the benefits of § 64a(2): *In re Albert O. Brown* (S.D.N.Y., 1909) 171 F. 281; *Blessing v. Blanchard* (C.C.A.9, 1915) 223 F. 35.

Guilbert was the debtor's sales manager. He was responsible for all marketing and advertising activities of the corporation. He also negotiated and prepared proposals to be submitted to potential buyers. There were several commission agents working under his direction and, at one time, two regional sales managers. We think the facts lead to the conclusion that Guilbert was part of the management of the debtor corporation rather than a mere workman or salesman. We hold therefore, that he is not entitled to a wage claim priority under Section 64(a)(2).

## II.

Claim 49 is for an administrative expense of $5,500.00 pursuant to Section 64(a)(1). 11 U.S.C. § 104(a)(1). On June 29, 1977, the debtor and Chemico Air Pollution Control Corporation entered into an agreement whereby the debtor was to manufacture a self-propelled gas cleaning car. The delivery date was to be March 31, 1978. The debtor failed to complete the contract by that date and subsequently filed a petition for an arrangement on May 2, 1978. On May 24, this court approved a compromise agreement whereby the executory contract with Chemico was rejected and a sell-back of the partially constructed car was approved. The cost estimate sheets for both the original order and the sell-back agreement provided for a commission of $5,500.00.

The debtor first claims that Guilbert is not entitled to a commission because he had no agreement with Kopyt as to a commission on this order. The debtor explains the $5,500.00 commission provided in the cost estimate sheet for the sell-back

agreement by the fact that Kopyt used it to justify the highest price possible. We find this position untenable. Since, as we concluded above, there was no modification of the original employment contract, Guilbert is entitled to a two percent commission unless he agreed otherwise as to a specific order. Since Kopyt concedes that he had not agreed to anything with regard to the Chemico order, Guilbert is entitled to the $5,500.00 commission that he provided for himself in the cost estimate sheets.

 The remaining issue is whether this claim is entitled to priority as an administrative expense. We hold that it is not. The test for whether a given claim constitutes an administrative expense was well summarized in *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (C.C.A.1, 1976).

> For a claim to be entitled to first priority under § 64(a)(1), the debt must arise from a transaction with the debtor-in-possession. Where the claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business. When third parties are induced to supply goods and services to the debtor-in-possession pursuant to a contract that has not been rejected, the purposes of § 64(a)(1) plainly require that their claims be afforded priority. It is equally clear that a claimant who fully performs prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing. See *Denton & Anderson Co. v. Induction Heating Corp.*, 178 F.2d 841 (2nd Cir., 1949) (Frank, J.) [footnotes omitted].

Guilbert's right to a commission arose *before* the Chapter XI petition was filed. He was entitled to $5,500.00 when the order was accepted by the debtor. The fact that the contract with Chemico was rejected during Chapter XI proceedings did not effect his right to that commission since the right arose under his employment contract. But the fact that he may have assisted in the negotiation process after the petition was filed is irrelevant. His claim for a commission will be allowed as a general unsecured claim.

In summary, we hold that Guilbert is entitled to his claims for commissions on all of the orders set forth in Claim 48 except that of the Dravo Corporation. He is also entitled to a claim for the amount specified as vacation pay. This is a total of $27,838.61. Since it has been stipulated that $10,334.86 has been paid to Guilbert, he is entitled to an unsecured claim of $17,503.75. His claim for $5,500.00 (Claim 49) is likewise allowed as an unsecured claim for the reasons above set forth.

## FINDINGS OF FACT

1. Easton Car Corporation ("the debtor") is a Pennsylvania Corporation formed in January of 1976. It is the wholly owned subsidiary of the Industrial Car Manufacturing Co. and is engaged in the design and manufacture of specialized material handling cars.

2. In August of 1976, the claimant, Nicholas Guilbert ("Guilbert"), was hired as the debtor's sales manager. The terms of his employment agreement were set forth in a letter dated August 23, 1976, and signed by Donald E. Cummings, the debtor's then president. The letter stated that it was intended as a final confirmation of the terms of Guilbert's employment agreement.

3. The letter provided that Guilbert would receive a salary of $25,000.00, certain fringe benefits and a sales commission as outlined on an attached memorandum.

4. The memorandum provided for commission as follows:

> 1. In all first-time orders, either single units or multiples; either a new customer's first order or a new product to a new or old customer ..... 2%

2. On all second-time orders, for essentially the same item as previously purchased by the customer . . . . . 1%

3. For all orders after the second order for essentially the same item as purchased the first or second time . . . . . ½%.

The appropriate percentage was to be applied to the total sales price and was to be paid at the time of shipment.

5. The memorandum also provided that advances on commission could be made prior to shipment if so desired.

6. In January of 1977, Leon Kopyt was hired to replace Cummings as president of the debtor.

7. As the debtor's sales manager, Guilbert was in charge of all marketing and advertising activities. His duties included negotiations with potential customers. Such customers were usually referred to him by sales representatives under his supervision. The customer would submit contract specifications to Guilbert. Guilbert then negotiated and prepared a proposal stating specifications and price which was submitted to the customer. If the customer approved, an order was placed with the debtor by the customer.

8. In addition to commission sales representatives, Guilbert had several administrative employees and, at one time, two regional sales managers under his direction.

9. On several occasions Guilbert agreed to accept a reduced commission on a specific sales order.

10. The debtor did not enter into any profitable contracts during the period that Leon Kopyt served as the debtor's president prior to the filing of Chapter XI proceeding.

11. On May 2, 1978, the debtor filed a petition for an arrangement under Chapter XI of the Bankruptcy Act.

12. Claim 48 is for $24,443.75, of which $600.00 is claimed as a priority pursuant to Section 64(a)(2) of the Bankruptcy Act. 11 U.S.C. § 104(a)(2). The claim includes $480.75 for vacation pay and $23,963.00 for unpaid commissions on twenty-six first-time orders, nine second-time orders and an unspecified number of third-time orders.

13. The debtor has stipulated that Guilbert was entitled to the commission stated in Claim 48 for all first-time orders except the following:

1. ITT Grinnell Corporation job nos. 76U122, 76U124, 76U126, and 76U128 for which a commission of $460.00 is claimed.

2. Chemico Air Pollution Control Co. job no. 77U20, for which a commission of $2,262.00 is claimed.

3. CF&I Steel Corporation job no. 77U87, for which a commission of $3,673.56 is claimed.

4. Danieli of America Corporation job nos. 76U45, 76U171, for which a commission of $533.54 is claimed.

5. Weirton Steel Corporation job no. 77U137, for which a commission of $4,500 is claimed.

6. St. Regis Paper Company job no. 77U137, for which a commission of $327.90 is claimed.

7. Foster-Wheeler Energy Corporation job no. 78U30, for which a commission of $73.50 is claimed; and

8. Mack Truck, Inc. job no. 78U48 for which commission of $1,016.68 is claimed.

9. Dravo Corporation (no job number) for which a commission of $6,940.00 is claimed.

14. Of the first-time orders for which commission is contested, Guilbert agreed to a reduced commission on the Chemico Air Pollution Control and Weirton Steel contracts.

15. Guilbert personally negotiated and prepared all proposals for first-time orders. Third-time orders were handled by administrative personnel under his supervision.

16. Guilbert performed substantially the same tasks on change orders for jobs booked prior to his employment with the debtor as he did on initial orders.

17. The CF&I Steel contract was completed and shipped after Guilbert had resigned from his position with the debtor.

18. Guilbert provided a commission of $4,500.00 for himself in the cost estimate sheets for the Weirton Steel contract. The contract price was estimated at $931,405.00. Guilbert and Kopyt subsequently agreed that the debtor should submit a proposal with a total price of $807,000.00. No agreement was ever reached with regard to a commission on that contract.

19. The St. Regis Paper Co., Foster-Wheeler Energy Corporation, and Mack Truck, Inc., which were first-time orders, were unilaterally cancelled by each customer after they had been accepted by the debtor as was the third-time order by the Bethlehem Steel Corp., job no. 78U45.

20. The Dravo Corporation order was not accepted by the debtor before it was unilaterally cancelled by the buyer.

21. Claim 49 is for a $5,500.00 administrative expense pursuant to Section 64(a)(1) of the Bankruptcy Act, 11 U.S.C. § 104(a)(1).

22. On June 29, 1977, the debtor and Chemico Air Pollution Control Corporation entered into an agreement whereby the debtor was to manufacture a self-propelled gas cleaning car. The car was to be delivered on March 31, 1978.

23. The debtor did not complete the contract by the delivery date.

24. On May 24, 1978, a compromise agreement was approved by this court whereby the executory contract with Chemico was rejected and the partially completed car was sold back to Chemico at a price of $424,195.00.

25. On the cost estimate sheet for the original contract proposal, Guilbert provided for a commission of $5,500.00. That amount was also provided in the price of the partially completed car sold back to Chemico on May 24, 1978.

## CONCLUSIONS OF LAW

1. The terms of the employment contract between the debtor and Guilbert were contained in a letter to Guilbert from Donald E. Cummings, dated August 23, 1976. The letter was intended as a final confirmation of the terms of that contract.

2. The parties intended that the term "orders" as used in the contract would include change orders on contracts booked prior to Guilbert's employment.

3. Guilbert was entitled to a commission on a given order when it was accepted by the debtor. It was not necessary for Guilbert to personally negotiate every sales order to be entitled to commission. He was entitled to a commission on all sales orders negotiated personally or through an administrative employee under his supervision.

4. Guilbert is entitled to the amount stated in Claim 48 for vacation pay since the claim was prima facie evidence of his claim and the debtor presented no evidence in rebuttal.

5. Guilbert is entitled to claims for commission on all first, second and third-time orders set forth in Claim 48 except the first-time order of the Dravo Corporation.

6. Guilbert was not a workman, servant, clerk or traveling or city salesman within the meaning of Section 64(a)(2) of the Bankruptcy Act. 11 U.S.C. § 104(a)(2). Therefore, he is not entitled to a second priority for $600.00 of his commission under Claim 48.

7. Guilbert is entitled to a general unsecured claim of $17,503.75 on Claim 48.

8. Guilbert is not entitled to allowance of Claim 49 as an administrative expense of $5,500.00 on the Chemico Air Pollution Control Contract since the right to payment of Guilbert's commission arose from services performed prior to the commencement of the Chapter XI proceeding.

9. Guilbert is entitled to a general unsecured claim of $5,500.00 for commission on the contract described in Claim 49.

10. Guilbert is entitled to a total general unsecured claim of $23,003.75 for vacation pay and commission on the orders set forth in Claims 48 and 49.